**U.S. LAND SERVICES, INC., Allen Harding and Stacey Wyber, Appellants–Defendants,**

v.

**U.S. SURVEYOR, INC., Appellee–Plaintiff.**

No. 87A01–0406–CV–238.

Court of Appeals of Indiana.

April 26, 2005.

Adam Arceneaux, Brian J. Paul, Brian E. Bailey, Ice Miller, Indianapolis, IN, Attorneys for Appellants.

Danny E. Glass, Jessica A. McCarthy, Fine & Hatfield, Evansville, IN, Attorneys for Appellee.

**OPINION**

SHARPNACK, Judge.

In this interlocutory appeal, U.S. Land Services, Inc. ("Land Services"), Allen Harding, and Stacey Wyber (collectively, "Defendants") appeal the trial court's grant of a preliminary injunction to U.S. Surveyor, Inc. ("Surveyor"). The Defendants raise two issues, which we reorder and restate as:

I. Whether the trial court's finding that Surveyor's customer, prospect, and surveyor lists are trade secrets under the Indiana Uniform Trade Secrets Act, Ind.Code § 24–2–3–1 to –8, is clearly erroneous; and

II. Whether the trial court's preliminary injunction is overbroad.

We affirm in part, reverse in part, and remand.

The relevant facts follow. Surveyor is in the business of providing surveying services and survey coordination services nationwide. In general, a customer needing a survey will request a quote from Surveyor and other similar companies. Surveyor then identifies qualified surveyors in the area where the job is to be performed and requests bids from various surveyors. Surveyor selects a qualified surveyor, submits a quote to the customer, and if accepted by the customer, confirms that the job is completed satisfactorily. As part of its process, Surveyor has compiled databases of surveyors, customers, and prospective customers ("prospects").

Harding was employed by Surveyor as national sales manager and then as vice president of its national sales division until April 8, 2003, when Surveyor terminated Harding's employment. Wyber was employed by Surveyor as a survey processor and then as assistant manager of the national sales division until her employment was terminated on April 10, 2003. At some point, Harding and Wyber became involved with Land Services. Land Services also provides survey management and coordination services in direct competition with Surveyor.

Surveyor filed a complaint against the Defendants, alleged claims of violation of the Indiana Uniform Trade Secrets Act and breach of noncompete agreements, and requested an injunction. After an evidentiary hearing on Surveyor's request for a preliminary injunction, the trial court issued the following order:

## FINDINGS OF FACT

1. Surveyor is an Indiana corporation having its principal place of business in Evansville, Vanderburgh County, Indiana.

2. Land Services is an Indiana corporation having its principal place of business in Newburgh, Warrick County, Indiana.

3. Each corporation is duly authorized to conduct business within the State of Indiana.

4. Allen Harding resides in Newburgh, Warrick County, Indiana, as does the defendant Stacey Wyber. Harding was employed by Surveyor from March, 1998 to April 8, 2003 when his employment was terminated by Surveyor. During a portion of his employment with Surveyor, Harding was the national sales manager and a vice president of the national sales division of the company.

5. Before working for Surveyor, Harding worked at Allinder Engineering for five years as a survey manager, doing some survey field work and some marketing for that company.

6. Harding has an associates degree from the University of Southern Indiana, where he studied surveying and civil engineering. According to Harding, he is a few credits short of completing his bachelors degree at USI.

7. Harding's responsibilities in Surveyor's national division included managing the national survey coordination division, and survey coordination sales to clients. Stacey Wyber became employed at Surveyor on October 12, 2000, and was terminated by Surveyor from employment on April 10, 2003. Wyber served as a survey processor, was later promoted to assistant manager of the national division, and then was subsequently demoted back to the position of processor before being terminated as an employee of Surveyor.

8. Before working for Surveyor, Wyber had attended some college courses, and held various types of employment, including work as a mortgage loan processor for other employers.

9. Surveyor is in the business of surveying and survey management contracting for clients throughout the United States, and markets its services nationwide. Land Services is in the business of survey management and coordination, in direct competition with Surveyor. It has done or attempted to do survey management and coordination business throughout the United States since it began doing business in the spring of 2003.

10. Shortly after Wyber was terminated from her employment with Surveyor on April 10, 2003, she began to regularly visit Land Services' office, and accepted employment with that company at least by April 21, 2003. Wyber has maintained her employment with Land Services since that time. Her employment has included e-mail marketing, client contact and contracting, sur-

veyor location and contracting, and survey coordination and management of specific orders and survey projects. All of these functions are in direct competition with Surveyor, and are the same or similar functions and business she performed for Surveyor prior to her termination by the plaintiff. The evidence at hearing shows that Wyber primarily devotes her time most recently to survey processing and management.

11. Allen Harding claims no regular or other employment since his termination by Surveyor on April 8, 2003, and has drawn unemployment compensation benefits from the State of Indiana during at least a portion of this time. Harding claims to be anticipating employment with Land Services to do zoning reports, and to be soliciting business for Land Services for such business. The evidence does not show any zoning report sales by Harding throughout this time, and Harding testified he would eventually want to assume a position of Vice–President of Land Services, in charge of zoning reports, if such business may be developed for Land Services.

12. Surveyor alleges that both Harding and Wyber entered into non-competition agreements with Surveyor, and that these prevent them from employment with Land Services in competition with Surveyor. Harding admits signing his non-compete agreement, but asserts he was told at the time by a representative of Surveyor, a Vice–President, that the non-compete agreement was not enforceable, and not to worry about it.

13. Wyber did not authenticate her signature on the purported non-compete agreement produced by Surveyor and, although Surveyor president Feldbusch's signature appears as a witness to Wyber's on the document, Feldbusch admits he did not witness Wyber sign the document, but placed his name on the document as a witness because no one else had done so to authenticate Wyber's signature on the paper. Surveyor produced no other witness or evidence to authenticate Wyber's signature on the agreement, and such on Wyber's part has not been established at this time based upon the evidence before the court.

14. Julye Harding is Allen Harding's wife. She became employed by Land Services in April, 2003. Her prior business experience for several years had been as a manager of a retail carpet sales business. Julye Harding had no prior experience with a survey company, and had no prior land survey management business experience. Nevertheless, her starting salary with Land Services was Fifty-two Thousand Dollars ($52,000.00) per year, substantially in excess of what she earned earlier in the retail carpet sales business, and her employment gives strong indication of a means whereby a significant income amount might be provided to the Allen Harding family by Land Services.

15. Aric Pryor has an electrical engineering degree and full time employment with Flanders Electric Company in Evansville, Indiana. He and his wife also have a real estate management business with Allen Harding and Julye Harding,

consisting of a couple pieces of real estate which are rented for income. Aric Pryor before the spring of 2003 had no experience in survey management or coordination, but does project management for Flanders Electric.

16. Since his termination by Surveyor, Allen Harding has spent significant time at the Land Services' offices, being there on most weekdays for at least four or five hours per day.

17. The process used by Surveyor and Land Services in their national survey coordination efforts involves receiving a request for a quote from a prospective client, contacting local surveyors in the area where the job needs to be performed to get their bids, selecting the best bid by a qualified surveyor, marking up the bid for the survey coordinator's profit, submitting it to the prospective customer for approval and acceptance, then making sure the job is completed and the survey report contains all of the necessary information needed by the client for the project at hand.

18. Much of the survey coordination process is accomplished by use of form documents, correspondence, offer sheets, and the like. No recipients of these materials, whether they be surveyors or prospective clients, are advised any of these are confidential or secret, and no information contained on these documents purports to restrict them as such.

19. Surveyor purports, through its nationally available website, to offer performing land surveys, nationwide survey coordination services, sale of surveying equipment, subdivision design and layout, services relating to retention and detention ponds, utility route surveys, full valley cross-sections, airport layout and navigational control, zoning information, hydrology, park project surveys, aerial photos, industrial precision surveys, GPS/GIS surveys, engineering related to site development, volumetric surveys, cadastral surveys, infrastructure surveys, aerial photogrammetry, building design projects and other services.

20. Harding and Wyber mainly performed services for Surveyor relating to the national land survey coordination business, and some office work for land surveys actually done by Surveyor's crews. Neither Harding or Wyber performed work related to the additional services Surveyor offers to provide.

21. Neither Harding or Wyber actually worked on field survey crews for Surveyor during their employment. The non-competition agreement asserted by Surveyor against Harding and Wyber would prevent either from working as a member of a surveying crew, or performing work in the other services offered or performed by Surveyor, and is not limited to the national survey coordination business actually performed by Harding and Wyber for Surveyor.

22. Land Services did no business prior to Harding's termination by Surveyor on April 8, 2003. From that time and to September 16, 2003, Land Services did approximately $540,000.00 of gross sales. Land Services asserts its business was generated by the efforts of its three (3) employees, Wyber, Pryor and Julye Harding, by identifying

potential clients for Nationals Survey Coordination Services by searching the internet for real estate. investment trusts, real estate lawyers, who might have a need for survey coordination services, and then by using an e-mail marketing campaign to solicit inquiries and business for Land Services.

23. An original employee of Surveyor, Christy Stutsman, testified at hearing that she did not believe Land Services could generate the amount of gross sales it did from April through September, 2003, as a startup business, and stated Surveyor took three (3) years, more or less, to reach this gross sales level, and to grow its business to that extent. Michael Feldbusch, surveyor's president, corroborated Stutsman's testimony before the court.

24. Harding testified he had not done marketing for Land Services, but this testimony is suspect. Business cards identifying Harding as the president of Land Services had been printed, Harding's status as president of Land Services had been disclosed or represented to third parties, and the evidence shows that at least until the threat of litigation by Surveyor was made that Land Services and both Harding intended that he would in fact hold the office of president of Land Services. As stated above, Harding spends substantial time each day at Land Services' office, even though the zoning report business to which it is now claimed Harding is to be devoting his time is a negligible part of Land Services' activities, and has generated little interest or income to Land Services at this time. The evidence clearly does show that of the four (4) persons involved in Land Services since it began business, namely Aric Pryor, Stacey Wyber, Julye Harding and Allen Harding, that Allen Harding is the most experienced, most knowledgeable and the most valuable of the four (4) to Land Services, from a reputation and experience standpoint. The evidence shows that from the commencement of Land Services' business that Allen Harding has been intimately involved and an active participant in the development and performance of Land Services, and always intended to become affiliated with Land Services, either as an officer, employee or otherwise. The attempts to minimize Harding's public daily involvement with Land Services resulted from Surveyor's threat of litigation, and the contact by Surveyor's attorney threatening legal action against one or more of the defendants as the result of Harding's and/or Wyber's involvement with Land Services.

25. Harding referred and still refers clients of Surveyor to Land Services, and Pryor took possession of Harding's cell phone he used while employed at Surveyor, thereby receiving calls regarding survey coordination business through Harding's personal cell phone.

26. The non-compete agreement used by Surveyor, signed by Harding, and purportedly but not yet proved as signed by Wyber, included the following:

Employee/contractor agrees that at no time during the term of this agreement, or for a period of three (3) years immediately following the termination of this agreement

and/or termination of employment or business relationship, thereunder, will the employee/contractor, for him/herself or in behalf of any person, partnership or corporation other than "US Surveyor, Inc.", engage in the services provided by U.S. Surveyor, Inc., within the continental United States.

27. Without question, Surveyor maintains valuable business information developed over the approximately eleven (11) years it has existed and done business doing survey coordination. This would include client lists, qualified surveyor lists, and prospective customer lists. Feldbusch expressed his opinion that the value of this information would exceed one point five million dollars.

28. Danny Day, a systems administrator for Surveyor, stated he checked the computer used by Harding at Surveyor the same day Harding was terminated from employment. He determined from this examination that the last file opened on the computer was named "commercialclient.zip". When Day attempted to open this file to review the same, the A drive of the unit was activated. This led Mr. Day to believe this file had been transferred to the A drive for copying onto a disc that could be used to take the information away from the computer. Mr. Day also stated that the "Allen H" was gone and could not be recovered by Day. The "Allen H" computer file contained significant information regarding Surveyor's national survey coordination business, was available for use by Harding and other of Surveyor's employees, and its use was not limited or restricted to use by Allen Harding.

29. Several other files listed on Harding's computer at Surveyor had been deleted from the unit, and were shown as transferred to the A drive of the computer.

30. Contained within the CAD recent file list on Harding's computer were Land Services' logos, as well as a file entitled USLS (U.S. Land Services)—Commercial Client.zip.

31. The evidence also shows that Allen Harding accessed and received e-mail to and from Land Services through a Land Services' account set up for him.

32. As a part of its business, Surveyor designates "affiliated" surveyors by an asterisk in the surveyor database it maintains. [An] "affiliated" surveyor is one who pays money to Surveyor to receive preferential treatment for surveys Surveyor orders in a surveyor's geographical work area. Grusenmeyer–Scott and Associates is an affiliated surveyor of Surveyor. [An] asterisk appears for Grusenmeyer in the database, and its company name appears in all capital letters within the data-base. The same appears in a request for quote from Land Services to Grusenmeyer–Scott. The evidence show this may have occurred through a "mail merge" or other information transfer from Land Services' computer database to the request for quote submitted by Land Services to Grusenmeyer–Scott.

33. Michael Feldbusch, Surveyor's president testified that it appeared from his review of Land Services' client database that approximately eighty percent of the clients listed

were or had been clients of Surveyor in the past. Likewise, many of the surveyors contained within Land Services surveyor database are ones doing substantial business with Surveyor, and a large percentage of the surveyors contained in Land Services database are the same as ones appearing on Surveyor's surveyor list. At hearing, Surveyor produced a large quantity of surveyors names obtained over the internet, yet not appearing on Land Services' client or surveyor lists. Aric Pryor admitted in testimony that the information contained from available internet sources submitted by defendants was not in and of itself sufficient to create such database lists.

34. The evidence at hearing indicates that Harding had been involved and working with Pryor before his termination by Surveyor, and toward developing Land Services as a competitor to Surveyor for survey management and coordination business; that Surveyor is a nationwide business; that Land Services has tried to do business in at least thirty-three (33) states, and desires to do business in all states; Harding has provided information and services to Land Services to market and perform surveyor management and coordination services; Wyber has provided services to Land Services to market and perform survey management and coordination services; Land Services used Harding by various means to take Surveyor's customers and build its own business as a direct competitor to Surveyor; Land Services could not have made the sales or generated the volume of gross sales it did from April through September, 2003, without access to Harding, Wyber, and Surveyor's databases including clients, surveyors, and prospects; Surveyor's databases have been disclosed to Land Services and its employees, and operation of Land Services will result and has resulted in this information being used; Surveyor compiled a national database through the years of qualified surveyors, including contact information and a rating system regarding performance. This information is proprietary in nature and necessary for the profitable operation of Surveyor's survey coordination business, and includes mental impression, confidential information, work product, and other processes that are confidential, secret and proprietary to Surveyor's regular business operations in survey coordination and management; Surveyor has also through the years developed its national client database, including specific contact information, financial information, purchasing and revenue history for individual clients; Surveyor has also through the years developed and maintained a prospect database to identify those who have not yet used Surveyor's services, but may be candidates in the future to do so; both Harding and Wyber during their employment with Surveyor had access to Surveyor's confidential information, including the surveyor, client and prospect databases built up and maintained by Surveyor through the years; evidence supports Surveyor's contentions that Harding and/or Wyber did misappropriate Surveyor's information contained in its data-

bases, and provided or delivered the same to Land Services for its use in growing its national survey coordination business in direct competition with Surveyor; Land Services was aware through Pryor's close personal and business relationship with Harding that such information belonged to Surveyor and had been appropriated and misappropriated by improper means; Land Services has acquired and utilized Surveyor's confidential information, including but not limited to the misappropriated information from Surveyor's databases, knowing that such was acquired from Surveyor without Surveyor's consent, and by improper means; based upon the evidence at hearing for preliminary injunction, Surveyor has not proved the existence of the non-compete agreement with Wyber, and has not proved the validity or enforceability of the non-compete agreement as to either Harding or Wyber. The court would not at this time grant Surveyor's request for preliminary injunction prohibiting either Harding or Wyber from employment with Land Services; based upon the evidence presented at hearing, Surveyor's right to relief at this point is with regard to Land Services, and not as to Allen Harding or Stacey Wyber personally.

35. Although vast amounts of information may be obtained through internet sources regarding prospective clients and prospective surveyors for use by survey coordination companies, this does not mean that Surveyor did not intend its client, prospect or surveyor databases, each having substantial value to Surveyor, to be available or portable so that employees separating from the company might strip down or take whatever information they might desire to take with them, for the benefit of a new employer, or in starting or assisting a cohort or confidant in immediately establishing an aggressive, substantial competitor to Surveyor and its national survey coordination business. There is little doubt based upon the evidence presented to the court that this is what has occurred in this case, and this is what has enabled Land Services to become immediately successful in growing its business, and at Surveyor's expense and loss.

36. As the enforce ability [sic] of the non-compete agreements as to Harding and Wyber appears to the court at this time to be suspect at best, with Surveyor's prospects of successfully enforcing the non-compete agreement to be questionable, the evidence at hearing does not support the grant of a preliminary injunction based upon these non-compete agreements, either as to Harding or as to Wyber, and the court does not enter any such preliminary injunction as to these personal defendants that would prevent them from employment or continuing relationship with Land Services.

## CONCLUSIONS OF LAW

1. Any finding of fact deemed to be a conclusion of law shall be a conclusion of law, and any conclusion of law deemed to be a finding of fact shall be a finding of fact.

2. This court has jurisdiction over the parties and subject matter of this action.

3. A preliminary injunction should not be granted except where the law and facts are clearly within the moving party's favor. *Boatwright v. Celebration Fireworks, Inc.*, 677 N.E.2d 1094, 1096 (Ind.Ct.App. 1997).

4. Surveyor's development through the years of proprietary and confidential information, including information databases regarding clients, prospects and surveyors, as maintained by Surveyor, constitutes trade secrets pursuant to Indiana law, and is protected information under I.C. 24–2–3–1, et seq.

5. Land Services misappropriation of Surveyor's trade secret information has resulted in Surveyor incurring damages, including significant lost profits, but assessment as to the kind and extent of monetary damages recoverable by Surveyor shall be reserved for trial on the merits between the parties.

6. Because of Land Services['] misappropriation of Surveyor's trade secrets, Surveyor has no adequate remedy at law or otherwise, for the immediate irreparable harm, loss, injury, and damages which has been and will continue to be done by the willful violation of Land Services of the Indiana Trade Secrets Act, I.C. 24–2–3–1, et seq.

7. Pursuant to I.C. 24–2–3–3, Surveyor is entitled to injunctive relief to prevent the actual and threatened harm, to eliminate Land Services' commercial advantage, and to prevent future irreparable harm.

8. Allen Harding and/or Stacey Wyber, but more probably Allen Harding, have disclosed and failed to protect the secrecy of the confidential information acquired as Surveyor employees by disclosing this information to Land Services for its benefit, and to Surveyor's detriment in its business. The evidence clearly indicates that a "harvesting" of Surveyor's computer database information occurred prior to Harding's termination of employment with Surveyor, and that Land Services has had the benefit of such information in growing its business from and after April, 2003, at Surveyor's expense.

9. The evidence at hearing does not show sufficiently at this time that the non-competition agreements asserted against Harding and Wyber are reasonably limited in time, geographic area, or scope, such that the court at this time would grant to Surveyor a preliminary injunction against Harding and Wyber based upon the asserted non-competition agreements signed by them. As set forth above, plaintiff at this time has not sufficiently proved the execution of the non-competition agreement by Wyber, and her testimony does not serve to authenticate the same as to her. This ruling does not affect the court's finding that Harding and/or Wyber, but more probably Harding under the circumstances, carried away from Surveyor proprietary information and trade secrets which was then used by Land Services to begin and grow its national survey coordination business, in direct competition with Surveyor.

10. Convenants not to compete are in restraint of trade, and are not favored. Courts construe these

agreements strictly against an employer and enforce them only if the agreements are reasonable. *Bridgestone/Firestone, Inc. v. Lockhart,* 5 [F.Supp.]2d 667, 682 (S.D.Ind.1998), citing *Harvest Ins. Agency v. Inter–Ocean Ins. Co.,* 492 N.E.2d 686, 688 (Ind.1986). The determination of whether a non-competition agreement is reasonable is a question of law for the court. *Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276, 280 (Ind.1983). If a non-competition agreement is unreasonably broad in its prohibitions, the courts do not rewrite the agreement or enforce it to the extent that such enforcement would be reasonable, as overly broad restrictions are not enforceable to any extent. *Bridgestone/Firestone, Inc. v. Lockhart, supra.*

11. Based upon the evidence at hearing, the court cannot say that Surveyor has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case regarding the enforceability of the non-competition agreements asserted against Harding and Wyber, and Surveyor is therefore not entitled to preliminary injunctive relief to enforce the non-competition agreements against these personal defendants.

12. Defendants are correct in asserting that the survey coordination process itself is not a trade secret, as the evidence at hearing clearly shows that numerous companies basically follow the same process in obtaining clients who need to have surveys done, then obtaining surveyors to actually perform the work, then obtaining the work done by the surveyors and providing the same to the client for whatever use for which the client needs the survey done. However, Surveyor has a protectable interest in its trade secret information and its customer goodwill. The defendant's actions have damaged and will continue to damage Surveyor if a preliminary injunction does not issue.

13. A trade secret is (1) information (2) deriving independent economic value (3) not generally known or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use and (4) the subject of efforts, reasonable under the circumstances, to maintain its secrecy. *Zemco Manufacturing, Inc. v. Navistar International Transportation Corp.,* 759 N.E.2d 239, 245 (Ind.Ct.App.2001), [*reh'g denied, trans. denied*].

14. The court finds that Surveyor has no adequate remedy at law, the granting of Surveyor's motion for preliminary injunction will not [disserve] the public interest, plaintiff has established a reasonable likelihood of success at trial, and the injury to Surveyor outweighs the harm to the named defendants in this case. Under Indiana's Trade Secrets Act, I.C. 24–2–3–1, et seq., Surveyor is entitled to injunctive relief to prevent the actual and threatened harm to Surveyor by the misappropriation of Surveyor's proprietary and confidential information, and the use of the same by Land Services to begin and grow its survey coordination business, at Surveyor's expense.

15. The kind and type of damages to which Surveyor is entitled to recover against the defendants, because

of the misappropriation and misuse of Surveyor's proprietary and confidential information by the defendants, is reserved for the trial of this matter on the merits.

16. Pursuant to law, Surveyor has proved its right to receive a preliminary injunction against the defendants to enjoin them from operating survey management business through Land Services, and until further order of this court. This preliminary injunction shall issue upon the giving of security by Surveyor in the amount of $500,000.00, with adequate and lawful sureties as provided by law, and for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. This preliminary injunction shall be binding only upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED BY THIS COURT** that Allen Harding, Stacey Wyber, and U.S. Land Services, Inc., are hereby preliminarily restrained and temporarily enjoined from conducting or participating in any manner in the survey management and coordination business through the defendant U.S. Land Services, and this order for preliminary injunction includes and covers contact with Surveyor's clients and surveyors included within Surveyor's computer database as of Harding's and Wyber's termination of employment by Surveyor in or about April, 2003. This preliminary injunction shall continue and remain in full force and effect until further order of this court.

Appellants' Appendix at 9–18.

The issuance of a preliminary injunction is within the sound discretion of the trial court, and the scope of appellate review is limited to deciding whether there has been a clear abuse of discretion. *Barlow v. Sipes,* 744 N.E.2d 1, 5 (Ind.Ct.App. 2001), *trans. denied.* When determining whether or not to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. *Id.;* Ind. Trial Rule 52(A). When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment. *Id.* The trial court's judgment will be reversed only when clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Id.*

To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence that: (1) the movant's remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) threatened injury to the movant outweighs the potential harm to the nonmoving party resulting from the granting of an injunction; and (4) the public interest would not be disserved. *Apple Glen Crossing, LLC v. Trademark Retail, Inc.,* 784 N.E.2d 484, 487 (Ind.2003). In order to grant a preliminary injunction, the moving party has the burden of showing, by a preponder-

ance of the evidence, that the facts and circumstances entitle him to injunctive relief. *Barlow,* 744 N.E.2d at 5. The power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor. *Id.*

## I.

The first issue is whether the trial court's finding that Surveyor's customer, prospect, and surveyor lists are trade secrets under the Indiana Uniform Trade Secrets Act, Ind.Code § 24–2–3–1 to –8 ("Act"), is clearly erroneous. The Defendants argue that Surveyor failed to show that it is likely to succeed on the merits of its claim under the Act because the customer, prospect, and surveyor lists are not trade secrets. Thus, according to the Defendants, the trial court erred by granting the preliminary injunction.

■■■ The Act concerns the misappropriation of trade secrets and provides that either actual or threatened misappropriation of trade secrets may be enjoined. Ind.Code § 24–2–3–2, –3. The Act defines "trade secret" as follows:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

I.C. § 24–2–3–2. Thus, a protectable trade secret has four characteristics: (1) information, (2) which derives independent economic value, (3) is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure. or use, and (4) the subject of efforts reasonable under the circumstances to maintain its secrecy. *Hydraulic Exch. & Repair, Inc. v. KM Specialty Pumps, Inc.,* 690 N.E.2d 782, 785–786 (Ind.Ct.App.1998). The determination of whether information is a trade secret is a fact sensitive determination. *Weston v. Buckley,* 677 N.E.2d 1089, 1092 (Ind.Ct.App.1997), *trans. denied.* The burden of proof is on the party asserting the trade secret to show that it is included in the categories of protectable trade secret information listed in the trade secrets statute. *Zemco Mfg.,* 759 N.E.2d at 245.

■■ The. Defendants' sole argument is that the customer, prospect, and surveyor lists are not trade secrets because they are readily ascertainable by proper means through trade publications, the yellow pages, and the internet. In *Amoco Prod. Co. v. Laird,* 622 N.E.2d 912 (Ind.1993), our supreme court determined that the phrase "not being readily ascertainable" is ambiguous and held that "where the duplication or acquisition of alleged trade secret information requires a substantial investment of time, expense, or effort, such information may be found 'not being readily ascertainable' so as to qualify for protection under the Indiana Uniform Trade Secrets Act." *Id.* at 919. Further, the court determined that "a trade secret often may include elements which by themselves may be readily ascertainable in the public domain, but when viewed together may still qualify for trade secret protection." *Id.* Thus, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Id.* at 919–920.

"[T]he effort of compiling useful information is, of itself, entitled to protection even if the information is otherwise generally known." *Id.* at 920. As our supreme court noted "[e]ven if information potentially could have been duplicated by other proper means, it is 'no defense to claim that one's product could have been developed independently of plaintiff's, if in fact it was developed by using plaintiff's proprietary designs.' That is, the mere availability of other proper means will not excuse a trade secret misappropriation." *Id.* at 918 (internal citations omitted).

Here, the trial court found that "Surveyor's development through the years of proprietary and confidential information, including information databases regarding clients, prospects and surveyors, as maintained by Surveyor, constitutes trade secrets pursuant to Indiana law, and is protected information under I.C. 24–2–3–1, et seq." Appellants' Appendix at 15. Although the Defendants argued at the preliminary injunction hearing that the information found in the databases was readily available through legitimate sources, the trial court noted that "Aric Pryor [of Land Services] admitted in testimony that the information contained from available internet sources submitted by defendants was not in and of itself sufficient to create such database lists." *Id.* at 14.

Further, the trial court found that Surveyor compiled a surveyor database that included contact information and a rating system regarding the performance of the surveyors. With the surveyor rating system, Surveyor had, through trial and error, identified qualified, competent surveyors throughout the United States and had also identified surveyors that did not meet its standards. Surveyor also compiled a client database that contained specific contact information, financial information, purchasing and revenue history for individual clients. The prospect database contained the identity of "those who have not yet used Surveyor's services, but may be candidates in the future to do so." Appellants' Appendix at 14. This database contained contact information, a history of contacts by Surveyor, and a rating of the prospect's response to marketing efforts.

While some of the information found in the three databases is readily available over the Internet and through other sources in the public domain, other elements of the database, such as the surveyor ratings, client histories, and prospect response ratings, are not readily available. The compilation of this information required a substantial investment of time, expense, and effort and gave Surveyor a competitive advantage. Thus, we conclude that the trial court's finding that the information found in the databases was not readily available and was a trade secret under the Act is not clearly erroneous.[1] *See, e.g., Amoco,* 622 N.E.2d at 920 (holding that information generated by Amoco regarding potential oil reserves was not readily ascertainable even though portions of the information were found in the public domain).

## II.

The next issue is whether the trial court's preliminary injunction is overbroad. An injunction is an extraordinary remedy that should be granted only with caution. *Boczar v. Meridian St. Found.,* 749 N.E.2d 87, 94 (Ind.Ct.App.2001). Injunctions must be narrowly tailored, and never more extensive in scope than is reasonably necessary to protect the interests of aggrieved parties. *Felsher v. Univ. of*

---

**1.** Land Services relies upon *Dicen v. New Sesco, Inc.,* 806 N.E.2d 833 (Ind.Ct.App. 2004). However, our supreme court has granted transfer in this case.

*Evansville,* 755 N.E.2d 589, 600 (Ind.2001). Moreover, the injunction should not be so broad as to prevent the enjoined party from exercising his rights. *Boczar,* 749 N.E.2d at 94. If an injunction is more extensive than is reasonably necessary to protect a party's interests or unduly prevents a party from exercising his rights, we may remand to the trial court for revision. *Id.*

The trial court granted a preliminary injunction and ordered the following:

> Allen Harding, Stacey Wyber, and U.S. Land Services, Inc., are hereby preliminarily restrained and temporarily enjoined from conducting or participating in any manner in the survey management and coordination business through the defendant U.S. Land Services, and this order for preliminary injunction includes and covers contact with Surveyor's clients and surveyors included within Surveyor's computer database as of Harding's and Wyber's termination of employment by Surveyor in or about April, 2003.

Appellants' Appendix at 17. We recognize that the parties here have much different interpretations of the preliminary injunction. The Defendants argue that the trial court's order is not narrowly tailored and is overbroad because: (A) the preliminary injunction forbids the Defendants from soliciting business from companies that have never done business with Surveyor; (B) the preliminary injunction forbids Land Services from contacting nearly 10,000 surveyors; and (C) the preliminary injunction prohibits the Defendants from engaging in the survey management business and is a blanket restraint on trade. We will address each argument separately.

### A. *Prospective Clients.*

 The Defendants argue that "[i]t is not legally reasonable to prohibit Land Services from soliciting 16,000 entities which have never been clients of [Surveyor], especially given that . . . . contact information for these entities is readily accessible within a few minutes on the Internet." Appellants' Brief at 17. The Defendants are referring to Surveyor's database of prospects. However, the trial court's order does not prohibit contact with Surveyor's prospects. Rather, the order clearly prohibits "contact with *Surveyor's clients and surveyors* included within Surveyor's computer database as of Harding's and Wyber's termination of employment by Surveyor in or about April, 2003." Appellants' Appendix at 17 (emphasis added). Consequently, the trial court's order is not overbroad on this basis. *See, e.g., Felsher,* 755 N.E.2d at 600–601 (holding that an injunction was not overbroad).

### B. *Surveyors.*

 The Defendants also argue that the trial court's preliminary injunction is overbroad because it prohibits them from contacting 10,000 surveyors throughout the United States. The trial court's order provides that "this order for preliminary injunction includes and covers contact with Surveyor's clients and surveyors included within Surveyor's computer database as of Harding's and Wyber's termination of employment by Surveyor in or about April, 2003." Appellants' Appendix at 17.

It is apparent from record that the Defendants are not prohibited from contacting all surveyors in the United States because some surveyors on Land Services' surveyor list are not on Surveyor's list. *Compare* Exhibit 2 and Exhibit 16. While, as the Defendants argue, the initial compilation of Surveyor's list may have been accomplished easily through the purchase of a list of 10,000 surveyors and their contact information, the Defendants fail to

recognize that the database also contains other proprietary information.

As we noted in determining that the database was a trade secret, Surveyor's database also contains a rating of the surveyors, and this rating was the result of a substantial investment of time, expense, and effort. Surveyor was able to find reliable, competent surveyors through trial and error. The Defendants should not be permitted to use Surveyor's trade secrets to skip the trial and error phase to gain a competitive advantage. The trial court's order is narrowly tailored on this basis to protect Surveyor's trade secrets while still allowing the Defendants to identify other competent surveyors through trial and error. We conclude that the trial court's preliminary injunction prohibiting the Defendants from contacting surveyors listed in Surveyor's database is not overbroad on this basis. *See, e.g., Felsher*, 755 N.E.2d at 600–601 (holding that an injunction was not overbroad).

C. *Survey management business.*

▆▆▆ Finally, the Defendants argue that the preliminary injunction is overbroad because it prohibits them from engaging in the survey management business and is a blanket restraint on trade. The trial court's preliminary injunction provides that "Allen Harding, Stacey Wyber, and U.S. Land Services, Inc., are hereby preliminarily restrained and temporarily enjoined from conducting or participating in any manner in the survey management and coordination business through the defendant U.S. Land Services...." Appellant's Appendix at 17. Thus, Land Services is enjoined from operating its survey management and coordination business, and Harding and Wyber are enjoined from working for Land Services in the survey management and coordination business. The preliminary injunction does not prohibit Harding and Wyber from working for other survey management and coordination businesses to the extent that they do not contact the surveyors or clients identified in Surveyor's databases.[2]

According to the Defendants, the preliminary injunction is overbroad because it prohibits them from conducting its survey management and coordination business "for anyone anywhere." Appellants' Brief at 16. It is clear from the record that Surveyor's client and surveyor databases do not contain all possible clients and surveyors in the United States. Thus, the preliminary injunction prohibits Land Services from performing survey management and coordination with clients and surveyors that are not listed in Surveyor's databases and are not associated with Surveyor in any way. Furthermore, although, as we have noted, Harding and Wyber can work for other survey management and coordination businesses, they are not allowed perform survey management and coordination for Land Services with clients and surveyors that are not listed in Surveyor's databases and are not associated with Surveyor in any way. Consequently, we must determine whether such a preliminary injunction is permissible.

▆▆▆ In making this determination, we must keep in mind that we are reviewing the grant of a *preliminary* injunction. Preliminary and permanent injunctions

---

2. The preliminary injunction could also be read to prohibit Harding and Wyber from contacting Surveyor's clients and surveyors through Land Services but allow them to contact Surveyor's clients and surveyors if not working through Land Services. The trial court could not have intended such an interpretation of the preliminary injunction as it would allow Harding and Wyber to simply start a new business and continue to use Surveyor's trade secrets. Consequently, we reject such an interpretation of the preliminary injunction.

serve different purposes and, thus, may have different scopes. A preliminary injunction is a remedy that is generally used to preserve the status quo as it existed prior to a controversy pending a full determination on the merits of that controversy. *Tomahawk Vill. Apartments v. Farren,* 571 N.E.2d 1286, 1292 (Ind.Ct.App.1991). In order to make out a successful case for a preliminary injunction, a plaintiff need only show a prima facie case on the merits. *Id.* The hearing for permanent injunction allows the parties to adjudicate the facts of the controversy in much greater detail. *Id.* A trial court may grant a preliminary injunction and, upon further consideration, dissolve it and refuse to issue a permanent injunction. *Id.* at 1292–1293.

Neither Surveyor nor the Defendants focuses on the purpose of a preliminary injunction, which is to preserve the status quo as it existed prior to the controversy. *Id.* at 1292. The trial court found that prior to Harding's termination from Surveyor, Harding and Pryor had been developing Land Services as a competitor to Surveyor. The controversy here concerns Harding's misappropriation of Surveyor's databases, not the development of a competing business. The purpose behind the Act is to protect trade secrets, not to prevent competition altogether. *See, e.g., Hydraulic Exch.,* 690 N.E.2d at 788 (holding that "it is KM's trade secrets and not its customers or clients that are protected from appropriation under the [Act]. The injunction as it applies to [the competitor] should be limited to those solicitations made by [the competitor] in which [the competitor] might utilize KM's trade secrets including, specifically, transactions in which [the employee] participates, directly

or indirectly"). Further, the trial court found Surveyor failed to show it was likely to succeed in enforcing the noncompetition agreements, which would have prevented Harding and Wyber from competing with Surveyor. Thus, we must focus on protecting Surveyor's trade secrets rather than preventing Harding and Wyber from competing with Surveyor. *See, e.g., Harvest Life Ins. Co. v. Getche,* 701 N.E.2d 871, (Ind.Ct.App.1998) (holding that "Harvest seems to seek to prevent competition by its former agent more than it seeks to protect a trade secret"), *reh'g denied, trans. denied; Steenhoven v. College Life Ins. Co. of Am.,* 460 N.E.2d 973, 975 n. 7 (Ind.Ct.App.1984), *reh'g denied.*

Although the trial court found, and we agree, that Surveyor's databases are entitled to protection as trade secrets, as the Defendants points out, the trial court also found that "the survey coordination process itself is not a trade secret." Appellants' Appendix at 17. By enjoining Land Services from engaging in the survey coordination business and enjoining Harding and Wyber from working for Land Services in the survey coordination business, the preliminary injunction prevents the Defendants from soliciting business through Land Services from clients and surveyors not listed in Surveyor's databases and is more extensive in scope than is reasonably necessary to protect Surveyor's trade secrets, i.e., its databases.

According to Surveyor, the scope of the preliminary injunction was proper because "enjoining Land Services from survey coordination is the only way to eliminate commercial advantage gained by its misappropriation." [3] Appellee's

---

**3.** According to Surveyor, the trial court could not "police" any other type of injunction and would be unable to prevent the Defendants from utilizing Surveyor's trade secrets. Ap-

pellee's Brief at 33. We disagree. Our courts have commonly prohibited former employees from contacting clients or customers of the former employer in enforcing noncompete

Brief at 33. We recognize that Ind.Code § 24–2–3–3(a) governs the use of an injunction for an actual or threatened misappropriation of a trade secret and provides:

> Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.[4]

agreements and protecting trade secret. *See, e.g., Hydraulic Exch.,* 690 N.E.2d at 788; *Standard Register Co. v. Cleaver,* 30 F.Supp.2d 1084, 1100 (N.D.Ind.1998). Thus, Surveyor's argument that the trial court would be unable to enforce such an order is unpersuasive.

4. This sentence of the statute reflects the trend of limiting the duration of injunctive relief. *See* comments to UNIFORM TRADE SECRETS ACT, § 2 (1990). The comments to section 2 of the Uniform Trade Secrets Act, upon which our statute is based, provide:

> Section 2(a) of this Act [*see* Ind.Code § 24–2–3–3(a)] adopts the position of the trend of authority limiting the duration of injunctive relief to the extent of the temporal advantage over good faith competitors gained by a misappropriator. See, *e.g., K–2 Ski Co. v. Head Ski Co., Inc.,* 506 F.2d 471 (C.A.9, 1974) (maximum appropriate duration of both temporary and permanent injunctive relief is period of time it would have taken defendant to discover trade secrets lawfully through either independent development or reverse engineering of plaintiff's products).
>
> The general principle of Section 2(a) and (b) [*see* Ind.Code § 24–2–3–3(a) and (b)] is that an injunction should last for as long as is necessary, but no longer than is necessary, to eliminate the commercial advantage or "lead time" with respect to good faith competitors that a person has obtained through misappropriation. Subject to any additional period of restraint necessary to negate lead time, an injunction accordingly should terminate when a former trade secret becomes either generally known to good faith competitors or generally knowable to them because of the lawful

However, contrary to Surveyor's argument, prohibiting Land Services from operating its business and Harding and Wyber from working for Land Services is not necessary to eliminate the commercial advantage. Rather, prohibiting Land Services from operating its business by contacting clients and surveyors that are not listed in Surveyor's databases and prohibiting Harding and Wyber from working for Land Services in the survey management and coordination business[5] effectively serves to prevent them from competing

> availability of products that can be reverse engineered to reveal a trade secret.

UNIFORM TRADE SECRETS ACT, § 2 cmt. (1990). Thus, under Ind.Code § 24–2–3–3(a), if the trial court ultimately grants a permanent injunction, it could prevent the Defendants from contacting the clients and surveyors on Surveyor's databases for the period of time it would have taken them to create the databases lawfully through independent development plus an additional time period to eliminate commercial advantage.

5. We acknowledge that in *Ackerman v. Kimball Int'l, Inc.,* 652 N.E.2d 507, 510–511 (Ind. 1995), our supreme court affirmed a trial court's preliminary injunction prohibiting a former employee who had misappropriated trade secret customer and supplier lists from accepting or commencing employment with a competitor of his prior employer for a period of one year. There, in addition to being subject to the Act, the former employee was subject to a valid noncompetition agreement that prevented him from becoming "directly or indirectly engaged in inventing, improving, designing, developing or manufacturing, any products directly competitive with the products of Employer" for a period of one year. *Id.* at 510. While the trial court's injunction was broader than the terms of the noncompetition agreement, our supreme court held that enjoining the former employee from working for the employer's competitors for a year was arguably necessary to meet the threat of disclosure of the employer's trade secrets. *Id.* at 511. We find *Ackerman* distinguishable because, here, the trial court found that Surveyor was unlikely to succeed in enforcing the noncompetition agreements. Thus, we must focus on the use of the trade

with Surveyor at all rather than eliminating any commercial advantage received by the misappropriation of Surveyor's databases.[6]

In summary, while the portion of the trial court's injunction prohibiting the Defendants from contacting clients and surveyors found on Surveyor's databases is not overbroad, the portion of the injunction prohibiting Land Services from operating a survey management and coordination business and Harding and Wyber from working for Land Services in such a business is overbroad. Accordingly, we reverse the portion of the preliminary injunction that enjoined Land Services from conducting or participating in any manner in the survey management and coordination business and the portion that prohibited Harding and Wyber from working for Land Services in the survey management and coordination business. However, we affirm the trial court's injunction prohibiting Land Services, Harding, and Wyber from contacting Surveyor's clients and surveyors included within Surveyor's computer database as of Harding's and Wyber's

termination of employment by Surveyor in or about April, 2003. *See, e.g., Hydraulic Exch.*, 690 N.E.2d at 788 (holding that the injunction was overbroad).

For the foregoing reasons, we affirm the trial court's grant of a preliminary injunction to Surveyor in part, reverse in part, and remand for proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

FRIEDLANDER, J. concurs with separate concurring opinion.

BAKER, J. concurs in part and dissents in part with separate opinion.

FRIEDLANDER, Judge, concurring.

I agree with the majority in every respect, but write briefly to address the point raised by my colleague in dissent. We all agree the trial court was correct in concluding that under the Trade Secrets Act, Surveyor's surveyor database is a trade secret that appellants should be preliminarily enjoined from using. We all

---

secrets rather than Harding and Wyber competing with Surveyor.

6. We do not mean to imply that a trial court can never effectively prevent a business from operating as part of an injunction to prevent actual or threatened misappropriations of trade secrets. Two types of injunctions are common in trade secret cases. The first type of injunction is a "production injunction," which prohibits the manufacture of a product, and the second type is a "use injunction," which prohibits the use of trade secrets. *General Electric Co. v. Sung*, 843 F.Supp. 776, 778 (D.Mass.1994). "The common rationale for imposing a production injunction is that, where the misappropriated trade secrets are 'inextricably connected' to the defendant's manufacture of the product, a use injunction is ineffective because the misappropriator cannot be relied upon to 'unlearn' or abandon the misappropriated technology." *Id.* at 780. "An 'inextricable connection' is found where

the trade secrets form such an integral and substantial part of a comprehensive manufacturing process or technology that, absent the misappropriated trade secrets, the defendant would not be able independently to manufacture or design a comparable product." *Id.* A production injunction could conceivably result in the closure of a business where the business' sole product is the result of the misappropriation of a trade secret and a production injunction is issued. However, the proper scope of the injunction is to prohibit the business from producing the product connected with the misappropriation of the trade secret, not to prohibit the business from producing *any* product. *See, e.g., Head Ski Co. v. Kam Ski Co.*, 158 F.Supp. 919, 924 (D.Md. 1958) (enjoining the business from producing skis that were built upon the misappropriation of a trade secret, but permitting the business to proceed with its efforts to secure a patent on design features that were independently conceived).

also agree that the preliminary injunction was overbroad, at least with respect to its prohibition against Land Services operating a survey management and coordination business, and against Harding and Wyber working for Land Services while it conducts such business. The only point of disagreement is whether the customer database obtained from Surveyor's is a trade secret, and therefore a proper subject of the preliminary injunction. I agree that it is.

The dissent is persuaded otherwise upon the conclusion that the entries on that list are attainable through other sources—that is, through sources other than Surveyor's customer database. That is undeniably so, but does not settle the matter. Although all of the names on the customer database would presumably appear on one list or another through internet searches, trade sources, etc., there is no evidence that this precise compilation of contacts would result from a single search or could be culled from a single source. Thus, this particular compilation of potential customers is unique, and unquestionably the product, at least in part, of not-insubstantial business efforts on Surveyor's part. This alone qualifies it as a proper subject of preliminary injunction. Moreover, I note there is evidence that the potential customers on the list may be evaluated and rated on several different scales, utilizing software developed for Surveyor's. Presumably, with the aid of such software, the master list may be broken down into sublists, employing scales that measure and evaluate data obtained by Surveyor's in the course of its business operations. Again, I believe this arguably qualifies as a trade secret eligible for injunctive relief.

Finally, I must acknowledge that the sheer size of the customer list gave me pause in deciding whether the injunction was overbroad in this respect. As we note in the majority opinion, however, the list does not comprise the list of all potential customers in the area. In any event, we merely affirm here the issuance of a preliminary injunction. Assuming a permanent injunction will be sought, the appellants will have the opportunity at that time to more fully litigate the question of whether restricting them from contacting customers on Surveyor's customer database effectively prevents them from doing business in this field altogether. I reiterate my conclusion that there is enough before us to affirm the preliminary injunction in that respect.

Subject to these explanatory comments, I fully concur in the majority opinion.

BAKER, Judge, concurring in part and dissenting in part.

I agree with the majority decision affirming enforcement of the Trade Secrets Act as to Surveyor's surveyor database because it is inextricably tied to Surveyor's development of its ratings for particular surveyors contained within the database. I also agree that the preliminary injunction was too broad—especially considering that the non-competition agreements were held to be unenforceable for the purposes of the preliminary injunction. To be sure, the evidence shows that Harding had worked in the surveying business prior to his employment at Surveyor, and Wyber had surveying coordination and management experience from her employment with Surveyor.

I must, however, part ways with the majority's decision to include Surveyor's customer database as a trade secret. The majority identifies the key factor that prompts me to reach a different outcome as to the customer database: absent valid non-competition agreements, the focus is on protecting Surveyor's trade secrets—

not preventing Harding, Wyber, or Land Services from competing with Surveyor.

The trial court specifically found that "vast amounts of information may be obtained through internet sources regarding prospective clients and prospective surveyors for use by survey coordination companies, [but] this does not mean that Surveyor did not intend its client, prospect or surveyor databases, each having substantial value to Surveyor, to be available or portable so that employees separating from the company might take" the information with them upon separation from Surveyor. Finding No. 35. Surveyor's *intentions* are of no moment. It did not preserve its goodwill through valid non-competition agreements.

It is apparent that the identification of customers is readily ascertainable by those in the surveying management and coordination business through public information sources. Abundant evidence presented at the hearing disclosed that the information can be obtained through internet search engines, telephone directories, and the like. Hence, I cannot agree that such information meets the definition of a trade secret. In my view, the customer database did not derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use...." Ind.Code § 24-2-3-2. Accordingly, I cannot agree that Surveyor met its burden to show that the customer database constituted a trade secret. *See Zemco Mfg., Inc. v. Navistar Int'l Transportation Corp.*, 759 N.E.2d 239, 245 (Ind.Ct.App.2001), *trans. denied,* (determining that the party asserting a trade secret has the burden of proof).

Also, that Harding and possibly Wyber disclosed customer database information to Land Services is of no concern absent a showing that the customer database constituted a trade secret, or a showing that the non-competition agreements should be upheld. Here, the trial court's preliminary injunction as to the customer database effectively prevented competition instead of protecting Surveyor's trade secrets.

Therefore, I am compelled to concur in part and dissent.