**THORNTON–TOMASETTI ENGINEERS, Appellant–Defendant,**

v.

**THE INDIANAPOLIS–MARION COUNTY PUBLIC LIBRARY, Appellee–Plaintiff.**

No. 06A01–0602–CV–75.

Court of Appeals of Indiana.

Aug. 11, 2006.

Gerard L. Gregerson, Karl L. Mulvaney, Brad A. Wilt, Bingham McHale LLP, Indianapolis, IN, Timothy R. Moorhead, Wright, Fulford, Moorhead & Brown, P.A., Orlando, FL, Attorneys for Appellant.

E. Scott Treadway, Robert S. Daniels, Charles R. Whybrew, Tabbert Hahn Earnest & Weddle, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

This case arises out of the renovation and expansion of the Indianapolis–Marion County Public Library (the Project). Work on the Project commenced in September 2002, and is scheduled to be completed in February 2008. The estimated cost of the Project when work began was approximately $105 million.

Appellant-defendant Thornton–Tomasetti Engineers (Thornton) appeals from the trial court's denial of a preliminary injunction that it had sought with regard to work that it had performed for appellee-plaintiff, the Library. In particular, Thornton—the engineer involved in the Project—contends that the trial court erred in dismissing its request for a preliminary injunction because it had offered evidence on all of the elements required to obtain such relief. Thornton also maintains that the trial

court erred in denying its request to enter the Library's premises in order to conduct certain testing on the construction site, and seeks to appeal the trial court's grant of a protective order in favor of the Library with regard to Thornton's request to conduct the further testing.

Concluding that the trial court properly dismissed Thornton's request for a preliminary injunction, we affirm. We also grant the Library's motion to dismiss the portion of Thornton's appeal challenging the denial of its request to enter the premises to conduct further testing, as well as the matters relating to the protective order that was entered in favor of the Library.

## FACTS

On February 19, 1998, the Library contracted with Woolen, an architect, for the Project that involved: (i) the renovation of the Library building; (ii) the demolition of a multi-story annex building; (iii) the new construction of a six-story tower; (iv) the new construction of an underground parking garage that serves as the structural foundation for the tower; and (v) construction of a 350–seat auditorium. Woolen issued the final architectural plans, and Thornton was engaged to serve as the engineer of record on the Project.

On February 23, 2004, while work was being performed on the parking garage, representatives from the Library discovered a number of alleged defects in the concrete beams on the structure. As a result, the Library retained Construction Technology Laboratories, Inc. (CTL), to investigate and analyze potential problems with the garage. CTL requested design information and calculations from Thornton to assist in its analysis of the garage.

Thereafter, on April 12, 2004, CTL commenced non-destructive testing on the garage to evaluate the extent and significance of the alleged defects. CTL performed this testing in order to identify the location of reinforcing steel and to identify any voids in the concrete. CTL eventually reached the conclusion that the garage contained "major construction and design defects" that required repairs on "[a] vast majority of the columns and beams." Appellant's App. p. 954.

Following CTL's investigation and testing, the Library suspended construction on the garage on May 6, 2004. At some point, CTL determined that destructive testing was necessary to more thoroughly investigate and analyze the defects. CTL prepared, and Thornton allegedly agreed to, a Repair Plan dated June 16, 2004. The parties also allegedly agreed to a detailed testing and repair protocol on July 13, 2004 (the Repairs Manual), which set forth the process for testing, analyzing, and repairing structural defects in the garage.

In accordance with the Repairs Manual, all defects and repairs to the garage were to be documented, photographed, and/or videotaped as the work progressed. In August 2004, the Library commenced an action against Thornton and others,[1] alleging that Thornton was responsible for the damages associated with errors in the design of the garage. Hence, the Library claimed that it sustained damages in excess of $19 million. Thornton denied the allegations that its design was deficient and claimed that CTL's findings regarding the various defects in the structure were erroneous.

For the next several months, CTL continued to investigate and analyze the de-

---

1. The venue of this action was later transferred to the Shelby Circuit Court and eventually consolidated for purposes of discovery and pretrial proceedings with a separate, related action commenced by Shook LLC against the Library in Boone Circuit Court.

fects. Corrective measures to the garage were to be performed in accordance with the Repairs Manual. Hence, Thornton prepared various repair design documents for the Project subject to CTL's review. The Library claimed that Thornton failed to follow the procedures set forth in the Repairs Manual and became dilatory in issuing repair directives. Ultimately, Thornton refused to follow the Repairs Manual whenever a design issue arose. Finally, on May 18, 2005, Thornton formally retracted any agreement to follow the Repairs Manual, and the Project was further delayed. The Library then engaged Beam Longest & Neff and another company to design the repairs to the garage in order to compensate for Thornton's refusal to participate in the repairs process. By June 2005, the Library completed the repairs to a stage that enabled construction to resume.

In the fall of 2005, after approximately sixteen months of delay and several months of new construction following recommencement of work, Thornton suggested to the Library that certain "load tests" were necessary on three of the structural beams in the garage so that Thornton could verify the adequacy of its design and confirm or refute the allegations of the design errors. Load tests are generally designed to test the structural members within a building to the point of failure, and Thornton maintained that the results of such tests would settle the matter.[2]

On December 12, 2005, Thornton petitioned the trial court for injunctive relief in accordance with Trial Rule 65(A): (i) to prevent the Library from continuing with all physical investigations and repairs to all structural members on the Project that were alleged to be defectively designed; (ii) to require the Library to provide Thornton with detailed and specific information regarding alleged design defects; and (iii) to allow Thornton access to the site to perform its proposed load tests over a ninety-day period. Thornton alleged that because it did not have the required calculations and analyses that it had requested at the time of filing its motion, it was not able to specifically identify structural members for load testing at that time.

In support of its motion for a preliminary injunction, Thornton submitted an affidavit and the testimony of Robert DeScenza, Thornton's executive vice president, as well as evidence from Joseph G. Burns, the lead engineer on the project. Hearings were held on January 11, 19, and 20, 2006. It was determined that multiple beams in the garage failed to meet applicable building codes, and Burns admitted that at least one of the beams had "significant faults." Tr. p. 271. Burns further indicated that, although load tests were considered during the lengthy period of relative inactivity on the Project, the idea of such testing never became a particularized demand until late fall 2005 when construction already had resumed. Thornton then rested its case in chief on January 19, and the Library asserted that the request for injunctive relief should be denied in accordance with Indiana Trial Rule 41(B) because Thornton had failed to satisfy the requisite burden of proof to obtain injunctive relief.

Prior to the hearing on January 20, representatives from Thornton visited the Library's garage and selected three beams

2. The tests involved placing a certain and prescribed load on a specific portion of the structure for a specific duration while observing and measuring the deflections and behavior of the structure under the particular load. The load is applied in small increments so that the structure can be monitored in order to avoid any possibility of damage or collapse.

for load testing from the allegedly defective structure members that had been identified in CTL's summary. Thornton then moved to amend the relief it had requested under the Motion for Preliminary Injunction to narrow the scope of its proposed load testing to three beams. Thornton also represented to the trial court that it could likely complete the load testing of these three beams over the course of a weekend.

At the beginning of the January 20 hearing, Thornton served the Library with a "Request to Enter Land" in order to conduct load testing on particular structural members alleged by the Library to be defective. Appellant's App. p. 891–93. Thornton maintained that it sought to test only three beams over a seventy-two hour period for the purpose of defending itself against the Library's claim against it.

The trial court took the Library's motion to dismiss Thornton's request for a preliminary injunction under advisement until January 24, 2006. On that day, the trial court granted the Library's motion to dismiss Thornton's request for injunctive relief, finding that:

5. In support of the Motion, [Thornton] presented the affidavit of Robert P. DeScenza.

6. DeScenza later testified at the hearing on January 11, 2006, that [Thornton] had:

—Not identified locations in the Parking Garage appropriate for load testing;

—Not proposed the method for performing the load testing in the Parking Garage;

—Not performed any financial analysis of the cost of load testing in the Parking Garage;

—Based his estimate of a seventy-five (75) day testing period on anything other than his experience with a load test performed at least fifteen (15) years ago and that load tests, once planned, can be performed in as little as a weekend.

7. [Thornton] also offered the testimony of Joseph G. Burns ("Burns"), the [Thornton] engineer who applied his Professional Engineer's Seal to the designs for the Project.

8. The testimony of Burns established the following:

—The Library and CTL began providing [Thornton] with some information concerning alleged defects in design and construction throughout 2004, including during a CTL presentation in November 2004.

—That, in Burns' opinion, there were no design defects.

—Construction was suspended on the Project for approximately sixteen (16) months, while CTL continued to perform investigation, testing and analysis of the alleged defects. Although load tests were considered and perhaps discussed during this period of relative inactivity on the project site, the idea of load tests never ripened into a particularized demand for them until late Fall of 2005.

—Thornton was not denied access to the Project during the investigation, analysis and repairs process.

*CONCLUSIONS OF LAW*

(7) [Thornton] failed to establish the lack of other adequate remedies at law. [Thornton] failed to establish that an injunction to broadly enjoin repair work to all allegedly defectively designed beams and columns to permit unspecified load testing is required in order to provide [Thornton] an adequate remedy. T.R. 34 provides a legal remedy for the

harm that [Thornton] fears—inability to prove that its design was defective. Additionally, [Thornton] will have the opportunity to challenge the investigation, analysis and repair performed to the parking garage at the trial on the merits by expert testimony.

(8) [Thornton] failed to establish a prima facie case that the harm to [Thornton] by the denial of the Preliminary Injunction outweighs the harm to the Library by the approval of the Preliminary Injunction. [Thornton] did not offer any evidence of the actual harm or evidence that there would be no harm to the Library in the event the injunction is granted. That evidence is necessary to establish the third element of a preliminary injunction—that the harm to [Thornton] from not granting the injunction would exceed the harm to the Library from granting the injunction.

(9) [Thornton] did not offer evidence that the approval of the Injunction would not disserve the public interest.

Appellant's App. p. 48–51.

In response to Thornton's "Request to Enter Land," the Library served Thornton with a motion for a Protective Order on January 27, 2006, a brief in support of the motion, and a number of supporting affidavits. In essence, the Library argued that Thornton should not be permitted to conduct load tests—even on selected structural members—because (i) the burden and expense that would be sustained by the Library would be grossly disproportionate to any potential benefit that Thornton might derive from the test, and (ii) Thornton had ample opportunity to obtain the information sought, but waited nearly one and one-half years to request entry upon the Library's land to conduct the testing. Additionally, the Library argued that load testing on isolated structural members would provide little value to the Library and, therefore, a meaningful load test would require testing the entire garage, which would last for many months at a cost of nearly $20 million. In the end, the trial court granted the Library's Protective Order on February 1, 2006, that was premised, in part, on the following evidence:

(a) Load testing is not appropriate in all settings and is often impractical and uneconomical.

(b) The design of the beams; types and capacities varies, the widespread defects identified vary, and the as-built conditions are not fully known.

(c) A representative beam cannot be identified or tested.

(d) Furthermore, a test on an isolated beam would have limited application to the analysis of Thornton's design of the Parking Garage as a whole.

(e) Load testing would be of little value unless the entire Parking Garage, with its unique features, were to be tested.

(f) A meaningful load test would entail many months of time and cost approximately $20,000,000.

(g) Considerable disruption would result from load testing even a selected group of beams, thereby causing significant expense to the Library.

(h) Thornton's Request to Enter Land was served at a time when construction on the Project had recommenced.

(i) Through a combination of column repairs and temporary structural shoring, the Parking Garage was able to support the tower steel. As weight has been added to the tower steel through the addition of curtain walls, mechanicals and interior finishes, re-

pairs must be made as quickly as possible in order stay ahead of the new construction schedule and so that the Parking Garage can support the increasing loads.

(j) Repairs have stayed slightly ahead of new construction.

(k) However, even small delays in repairs would result in delays in construction. Since the construction schedule is dependent on the repairs continuing uninterrupted on the Project, construction would be stopped during the performance of load testing.

(l) Additional burdens would be experienced by the Library to the extent load testing is performed on the Project. The Project's construction manager would not allow construction to continue on the Project simultaneously with load testing due to concern (i) for the safety of construction workers on the Project; (ii) for the potential for large failure of beams, steel members or other damage of the existing structure; (iii) relating to IOSHA regulations; and (iv) relating to insurance and surety coverage. Therefore, the potential for negative construction schedule impacts would increase.

(m) Damage might also occur to either (i) the part of the Parking Garage that is being load tested; or (ii) a separate part of the Project structure that is not even being load tested. The beams, columns and structural steel are all interconnected. Load testing of one (1) or more beams may result in a failure of a concerted or steel beam or column in an entirely separate portion of the Project. If the Parking Garage structure failed the load test, the Project may be suspended and/or delayed for an extended period of time to repair the failure. If there is a failure of a beam or some other part of the structure during the load testing, the Project would be fur-

ther delayed and the Library will be exposed to additional damages, including delay damage claims asserted by contractors.

(n) In addition, one (1) or more contractors currently under contract to perform work on the Project likely would refuse to perform more work. In turn, the Library would be forced to rebid some work, thereby adding cost and expense to complete the Project. The bidding of the Project would not be able to commence until load testing was completed and results were known. The rebidding process could take at a minimum six (6) months. As a result of the known problems with the Project and other construction projects that will be under construction in the Indianapolis metropolitan area, a number of qualified bidders may elect not to participate in a rebidding process.

(o) In addition to delays to the construction schedule, the Library's claims analyst and scheduling consultant determined that the foregoing events expose the Library to significant financial hardship. The Library would be exposed to delay claims on top of those already submitted for past delays on the Project. Such delay claims would result in exposure to damages in the millions of dollars depending on the length of the delays.

Appellant's App. p. 891–1069.

Thereafter, on February 9, 2006, Thornton filed, among other things, a petition to certify the grant of the Library's protective order for interlocutory appeal. On February 21, Thornton filed a Notice of Appeal from the dismissal of its request for injunctive relief. The trial court then refused to certify the protective order for interlocutory appeal on March 6, 2006.

## DISCUSSION AND DECISION

### I. Standard of Review

■ The grant or denial of a motion to dismiss made under Trial Rule 41(B) is reviewed under the clearly erroneous standard. *Taflinger Farm. v. Uhl,* 815 N.E.2d 1015, 1017 (Ind.Ct.App.2004). In reviewing a motion for involuntary dismissal, this court will not reweigh the evidence or judge the credibility of the witnesses. *Id.* We will reverse the trial court only if the evidence is not conflicting and points unerringly to a conclusion different from the one reached by the lower court. *Chemical Waste Mgmt. of Ind., L.L.C. v. City of New Haven,* 755 N.E.2d 624, 635 (Ind.Ct. App.2001).

■ Next, we note that preliminary injunctions are generally used to preserve the status quo as it existed before a controversy, pending a full determination on the merits of the controversy. *U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.,* 826 N.E.2d 49, 67 (Ind.Ct.App.2005). To obtain a preliminary injunction, the moving party must demonstrate by a preponderance of the evidence that: (1) its remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) threatened injury to the movant outweighs the potential harm to the nonmoving party resulting from the granting of an injunction; and (4) the public interest would not be disserved. *City of Gary v. Mitchell,* 843 N.E.2d 929, 933 (Ind.Ct.App.2006). If the movant fails to prove any of these requirements, the trial court should deny a request for a preliminary injunction. *Apple Glen Crossing, LLC v. Trademark Retail, Inc.,* 784 N.E.2d 484, 487 (Ind.2003). The power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor. *Barlow v. Sipes,* 744 N.E.2d 1, 5 (Ind.Ct. App.2001).

■ The trial court is required to issue special findings of fact and conclusions of law when determining whether to grant a preliminary injunction. *Robert's Hair Designers, Inc. v. Pearson,* 780 N.E.2d 858, 863 (Ind.Ct.App.2002). We therefore must determine whether the evidence supports the trial court's findings, and whether the findings support the judgment. *Aberdeen Apartments v. Cary Campbell Realty Alliance, Inc.,* 820 N.E.2d 158, 163 (Ind.Ct. App.2005), *trans. denied.* Thus, we will determine whether the special findings of fact validly support the trial court's decision to issue the injunction, and whether the findings are supported by evidence of probative value. *Id.*

■ Finally, we note that the denial of a preliminary injunction rests within the trial court's sound discretion, and our review is limited to whether there was a clear abuse of that discretion. *Id.* An abuse of discretion occurs when a trial court reaches a conclusion that is against logic and the natural inferences that can be drawn from the facts and circumstances before the trial court. *R.R. Donnelley & Sons Co. v. N. Tex. Steel Co.,* 752 N.E.2d 112, 133 (Ind.Ct.App.2001). An abuse of discretion also occurs when the trial court misinterprets the law. *Ind. High Sch. Athletic Ass'n v. Durham,* 748 N.E.2d 404, 412 (Ind.Ct.App.2001).

### II. Denial of Preliminary Injunction

#### A. Adequate Remedy at Law and Irreparable Harm

Thornton first contends that the trial court erred in determining that Thornton failed to demonstrate that a broad injunc-

tion barring repair work to all allegedly defectively designed beams to permit unspecified load testing is required in order to provide Thornton with an adequate remedy at law.

 At the outset, we note that the trial court dismissed the injunction, finding that Thornton failed to establish three of the four elements necessary to maintain a preliminary injunction. Specifically, the trial court first determined that Thornton failed to establish that its remedies at law were inadequate such that irreparable harm would result if its motion for injunctive relief were denied.

Notwithstanding Thornton's claims, the evidence shows that Thornton will have the opportunity to challenge the Library's investigation, analysis and repair work performed on the parking garage at the trial on the merits through expert testimony. Appellant's App. p. 50–51. Specifically, both the evidence and the trial court's findings demonstrate (1) that the Library and CTL have provided information to Thornton during the course of the Repairs to the Project; (2) that Thornton was not denied access to the Project during the investigation, analysis and repair process; and (3) that the evidence relating to the conditions of the Parking Garage have been photographed, documented, or otherwise preserved. *Id.* at 49–51. Additionally, the evidence shows that Thornton possesses sufficient information to formulate its defense to the claims brought by the Library in the absence of an injunction. To be sure, DeScenza testified that all Thornton required to analyze whether the design of the garage was deficient was a set of structural and architectural drawings and relevant building codes. Tr. p. 126–27. DeScenza acknowledged that Thornton had all three pieces of information and that no additional information from CTL or the Library was required.

*Id.* at 127. Even so, to the extent that Thornton might need required additional information, the Library is preserving that information, *see* Appellant's App. p. 49–51, and Thornton may avail itself of any number of discovery remedies to obtain the information that the Library is preserving. As a result, Thornton has failed to show that the trial court abused its discretion in determining that Thornton had adequate legal remedies or that it would suffer irreparable harm if its request for injunctive relief was not granted. Thus, the trial court properly denied Thornton's request for injunctive relief on this basis.

*B. Weight of Potential Harm*

 Notwithstanding the above, Thornton further maintains that the trial court erred in determining that it failed to establish a prima facie case that the harm to Thornton outweighs the harm to the Library. In essence, Thornton contends that "without an opportunity to load test, Thornton will certainly suffer an injury by having to defend a $40 million claim without the fair and reliable result that load tests provide." Appellant's Br. p. 37.

Again, as noted above, Thornton's own evidence—particularly the testimony of DeScenza—established that the evidence in its possession, including the drawings and building codes, was sufficient for Thornton to determine if any design defects existed on the garage structure. Also, while Thornton submitted an affidavit in support of its contention that load testing of the beams would be its "best evidence," appellant's br. p. 37, that evidence was not before the trial court when the order dismissing the injunction was issued. Thus, that affidavit may not be considered in determining whether load testing was the best evidence available to Thornton to defend the action. *See Chesterfield Mgmt., Inc. v. Cook,* 655 N.E.2d 98, 101 (Ind.Ct.App.1995) (observing that

the record on appeal only consists of matters before the trial court at the time the trial court rules and does not contain any subsequent pleadings).

Finally, the evidence established, and the trial court found, that:

—Thornton has not proposed a method for performing load tests;

—Thornton has not performed any financial analysis of the cost of load testing; and

—Even though the actual load test may only take as little as a weekend to perform, planning and preparing for the test may take as much as seventy-five days.

Appellant's App. p. 49–51, tr. p. 89–98.

While Thornton presented no evidence to show that harm might result to the Library from the proposed load testing, it may easily be concluded that a delay of seventy-five days or more would cause the Library substantial harm. During that time period, the Library could not conduct any repairs, which would obviously delay the Project even more. Thus, the more the Project is delayed, the more the Library is harmed. As a result, the trial court properly determined that Thornton failed to demonstrate that Thornton's harm outweighs the harm to the Library.

### C. Disservice to the Public Interest

■■■ Finally, while we have concluded that Thornton has failed to meet the above requirements for injunctive relief, we also address its contention that its requests for load testing and injunctive relief would serve and benefit the public. In essence, Thornton argues that load testing would be beneficial because it would necessarily minimize future "costly repairs." Appellant's App. p. 39.

■■■ Generally, the effect of an injunction upon the public interest must be weighed with the relative potential harms

to the parties. *Hacienda Mexican Rest. of Kalamazoo Corp. v. Hacienda Franchise Group, Inc.*, 569 N.E.2d 661, 666 (Ind.Ct. App.1991). When an injunction is sought that would adversely affect the public interest, we may withhold relief until a final determination of the rights of the parties, although postponement may be burdensome. *Fumo v. Med. Group of Michigan City, Inc.*, 590 N.E.2d 1103, 1108 (Ind.Ct. App.1992).

Notwithstanding Thornton's contentions, the evidence before the trial court established that:

—Thornton had not identified locations in the Parking Garage appropriate for load testing;

—Thornton had not proposed the method for performing the load testing in the Parking Garage;

—Thornton had not performed any financial analysis of the cost of load testing in the Parking Garage;

—Even though Thornton alleged that the actual load test may only take as little as a weekend to perform, planning and preparing for the test may take as much as seventy-five days.

Tr. p. 89–98. Had Thornton been successful in obtaining an injunction enjoining all investigations and repairs in the parking garage, the Project may very well have been delayed for almost three months. Such a delay would have damaged the Library. Moreover, Thornton merely speculates that its proposed testing would have minimized "costly repairs" only in the event that the structural members did not have to be remediated. Tr. p. 207. Hence, Thornton has failed to establish grounds for the preliminary injunction when considering the substantial cost that might result to the public.

In sum, it is apparent that the trial court simply weighed the evidence before it and determined that Thornton's remedies at

law were adequate and found that Thornton would not be irreparably harmed by its refusal to issue injunctive relief. Furthermore, the trial court's findings relating to the disservice of the public interest are supported by the evidence, and those findings support the judgment. Therefore, we conclude that Thornton failed to establish grounds for the issuance of a preliminary injunction.

### III. Request to Enter Land and Protective Order

As a final matter, Thornton is attempting to appeal the trial court's denial of its request to enter the construction site and perform additional load testing on only three of the structural beams in the Garage, along with the issuance of a Protective Order in favor of the Library with regard to the proposed testing. In response, the Library has moved to dismiss this portion of the appeal, claiming that the issues relating to Thornton's request to enter the land and conduct additional testing on the Project are not properly before us.

■■■ Our Supreme Court has observed that an appeal may be taken from certain interlocutory orders in accordance with Indiana Appellate Rule 14(B) if the trial court, in its discretion, certifies its order and the Court of Appeals accepts jurisdiction over the appeal. *See Berry v. Huffman,* 643 N.E.2d 327, 329 (Ind.1994) (recognizing that judgments or orders as to less than all of the issues, claims, or parties remain interlocutory until expressly certified as final by the trial judge). It is the duty of this court to determine whether it has jurisdiction before proceeding to determine the merits of any case. *Dailey Oil, Inc. v. Jet Star, Inc.,* 650 N.E.2d 345, 346 (Ind.Ct.App.1995). When this court determines that it does not have jurisdiction, it shall dismiss the appeal.

*Bayless v. Bayless,* 580 N.E.2d 962, 964 (Ind.Ct.App.1991).

As noted above, the trial court heard evidence with regard to Thornton's motion for the preliminary injunction on January 11, 19, and 20, 2006. Thornton rested its case-in-chief on January 19, and just prior to the presentation of evidence on January 20, Thornton served the Library with its "Request to Enter Land" in order to conduct testing on a limited number of structural beams in the garage. The trial court denied Thornton's request for injunctive relief on January 24, 2006. The trial court then denied Thornton's request to enter the land and granted a protective order in favor of the Library with regard to this matter on February 1, 2006. Thereafter, on February 21, 2006, Thornton filed its notice of appeal from the dismissal of its request for injunctive relief. On March 6, 2006, the trial court refused to certify the matters relating to the protective order and Thornton's request to enter the land for interlocutory appeal. *Id.* at 25, 1279.

In examining the above chronology of events, it is apparent that the only matters that are properly before us in this appeal are those that relate to Thornton's request for injunctive relief, inasmuch as the issues regarding the protective order were not certified for appeal. Hence, because the issues relating to Thornton's request to enter the land and the protective order granted in favor of the Library were not certified by the trial court for interlocutory appeal, we decline to address those claims and grant the Library's motion to dismiss that portion of appeal.

The judgment of the trial court is affirmed.[3]

MAY, J., concurs.

SULLIVAN, J., concurs in result with opinion.

---

3. We also note that throughout the pendency of this appeal, the Library and Thornton have

SULLIVAN, Judge, concurring in result.

It is undisputed that in dismissing Thornton's Motion for Preliminary Injunction, the trial court concluded that Thornton's adequate remedy at law lay within Trial Rule 34. More to the point, T.R. 34(A)(2) permits entry onto a premises for purposes of testing.

Although the majority holds that matters concerning the issuance of the protective order in favor of the Library are not properly before us, it is equally undisputed that the trial court did indeed issue such order preventing Thornton from entering the project premises in order to conduct load tests.

The result of the protective order, although not properly before us as to the merits thereof, was undeniably to remove the remedy of T.R. 34(A)(2) from Thornton's remedies at law.

Notwithstanding this glitch in the interrelationship between dismissal of the Motion for Preliminary Injunction and denial of Thornton's request to enter the premises for purposes of testing, the dismissal of the Motion for Preliminary Injunction was appropriate because Thornton failed in other respects to carry its evidentiary burden.

For this reason, I concur in result.

both moved to strike certain portions of the opposing party's briefs. Upon consideration of these motions, and in light of our disposition of the issues above, we grant the Library's motion to strike portions of Thornton's brief, as the materials requested to be stricken relate to matters involving Thornton's request to enter the land, the protective order, and references to discovery matters that pertain to a separate lawsuit. Such matters are irrelevant and impertinent to our disposition of the issues in this appeal. On the other hand, we do not perceive the materials that Thornton has moved to strike from the Library's appellate brief as misleading or erroneous so as to affect our review of this appeal. Therefore, we deny Thornton's motion to strike.