

**FILED**

Apr 14 2015, 9:58 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEYS FOR APPELLANT | ATTORNEYS FOR APPELLEE ERIC J. SPICKLEMIRE |
|---|---|
| George M. Plews | Thomas F. O'Gara |
| Brianna J. Schroeder | Bradley R. Sugarman |
| Jonathan Penn | Jeffrey D. Stemerick |
| Plews Shadley Racher & Braun LLP | Taft Stettinius & Hollister, LLP |
| Indianapolis, Indiana | Indianapolis, Indiana |

# IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| 5200 Keystone Limited Realty, LLC, | April 14, 2015 |
| *Appellant-Defendant,* | Court of Appeals Case No. 49A02-1403-CT-188 |
| v. | Appeal from the Marion Superior Court |
| Filmcraft Laboratories, Inc., Eric J. Spicklemire, Portrait America, Inc., A.C. Demaree, Inc., Clean Car, Inc., and The Wax Museum & Auto Sales, Inc., | Cause No. 49D07-0310-CT-003394 |
| | The Honorable Michael D. Keele, Judge |
| *Appellee-Plaintiff* | |

**Friedlander, Judge.**

[1] This litigation involves a dispute over responsibility for the costs of environmental cleanup of commercial real estate (the Site) located near the

corner of 52nd St. and Keystone Avenue in Indianapolis. 5200 Keystone Limited Realty, LLC (KLR) acquired the subject property from Apex Mortgage Corporation (Apex) after Apex had acquired the property through foreclosure proceedings against Eric Spicklemire, who purchased the property in 1981. Apex filed its complaint against Filmcraft Laboratories, Inc. (Filmcraft), a company owned by Spicklemire. The complaint alleged causes of action under these three statutes: 1) Ind. Code Ann. § 13-11-2-70.3 (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through March 24 2015) (creating an "environmental legal action" (ELA), which is a legal action "brought to recover reasonable costs associated with removal or remedial action involving a hazardous substance or petroleum released into the surface or subsurface soil or groundwater that poses a risk to human health and the environment"); 2) Ind. Code Ann. § 13-30-3-13(d) (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through March 24, 2015) (creating an action to recover reasonable expenses and attorney fees incurred by a landowner on whose land solid waste has been illegally dumped); and 3) Ind. Code Ann. § 6-1.1-22-13 (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through March 24 2015) (liability for back property taxes). KLR was substituted as plaintiff after it purchased the Site from Apex. Shortly thereafter, KLR amended its complaint, adding as defendants Spicklemire, Portrait America, Inc., A.C. Demaree, Inc., Russ Dellen, Inc. (RDI), Clean Car, Inc., and The Wax Museum & Auto Sales. KLR appeals the grant of Spicklemire's motion to

dismiss with respect to KLR's statutory causes of action, and a grant of summary judgment with respect to certain common-law claims presented by KLR at trial. KLR presents the following consolidated, restated issues for review:

1. Did the trial court err in excluding expert testimony regarding whether the Wax Museum & Auto Sales and Clean Car caused or contributed to the contamination at the Site?

2. Did the trial court err in entering summary judgment against KLR on its common-law claims?

3. Did the trial court err in dismissing KLR's complaint pursuant to Trial Rule 41(B) on grounds that KLR failed to present sufficient evidence to show Spicklemire caused or contributed to chlorinated solvent and petroleum hydrocarbon contamination of the Site?

[2] We affirm.

[3] In order to understand the issues involved in this case, we must first set out in detail the history of the ownership and activity on the Site. A.C. Demaree Inc. (Demaree) owned and operated a commercial dry cleaning business on the Site from at least 1948 to 1973. It is undisputed that during this time, dry cleaners used two solvents to clean textiles: perchloroethylene, a chlorinated solvent, and Stoddard solvent, a petroleum hydrocarbon. Demaree stored these solvents in tanks at the Site.

[4] In 1973, Demaree sold the Site to Robert Dellen, who in turn conveyed the Site in 1979 to Dellen Realty, Inc. (Dellen Realty), a predecessor of RDI. From 1974 to 1981, Filmcraft leased the Site from Dellen and Dellen Realty. In

January 1981, Spicklemire and his father purchased the Site from Dellen Realty, and from 1981 to 2000, Spicklemire leased the site to Filmcraft. Spicklemire was a shareholder, officer, and employee of Filmcraft, and became the company's president in 1994, when he became sole owner of Filmcraft and the Site. He remained in this position until the company ceased operation. Portrait America, also a Spicklemire-owned entity, leased the Site from 2000 to 2001. During its years of operation, Filmcraft sublet the back of the Site to several auto-detailing operations. These included Clean Car, Inc. and The Wax Museum & Auto Sales (collectively, the Detailers).

[5] During the time its business was located on the Site, i.e., 1974 to 2000 or 2001, Filmcraft operated a commercial photo-processing operation. This process was accomplished by the use of machines, which ran approximately eight to twelve hours per day. These machines processed film and printed images on paper. The processing generally involved the feeding of paper through a machine that sent the film or paper through a series of chemical baths and water-wash tanks. The chemicals used in this process included bleaches, fixers, and stabilizers manufactured by Kodak and other suppliers. Such chemicals were highly diluted by water. None of these chemicals contained chlorinated solvents. Filmcraft documents indicate that the only petroleum hydrocarbon used in Filmcraft's operation were white grease and photographic lacquer. White grease was used to lubricate a single piece of equipment, and a single, three- to four-inch tube lasted the entire time that Filmcraft was in operation on the Site.

[6]   During his ownership of the Site, Demaree had installed trench drains throughout the Site that connected to the sewer. Later, photo-processing chemicals spent in Filmcraft's operations were discharged from its machines through a silver recovery device in the form of an effluent and, per manufacturer recommendations and standard industry practice, discharged into the trenches Demaree had installed. This effluent contained minute amounts of silver but did not contain chlorinated solvents or petroleum hydrocarbons. Subsequent testing indicated the presence of silver in a sediment sample collected from inside the trench where photo-processing effluent was discharged. No silver above regulatory action levels, however, was found in the soil and groundwater samples taken at the Site in 2013. On occasion, paper from the paper processor would clog the drain and form a sludge. This sludge did not contain chlorinated solvents or petroleum hydrocarbons. In 2013, the sewer lines were scoped by Gurney Bush, Inc. (GBI) with a video camera, which revealed certain offset joints in the sewer line, but no leaks were found.[1] Also, GBI's investigation confirmed that the sewer on the Site was usable and that water sent down the pipes went into the city's main sewer line.

[7]   Filmcraft used small cans of aerosol lacquer that were approximately the size of a can of spray paint. Each can would last approximately one month, and the aerosol lacquer was applied directly to photographs in a ventilated area on the Site. Any overspray ended up on a peg board that was used to hold the

---

[1]   Indeed, GBI indicated that its procedure was not intended to look for leaks.

photographs or was vented out of the building through an exhaust fan. The testing indicated that no lacquer was released to the soil or groundwater at the Site.

[8] As indicated, the rear part of the Site was sublet to various auto-detail companies during Filmcraft's operation. The rear of the Site was separated from Filmcraft's operation by a wall and a windowless door. The Detailers had their own main entrance to the Site on the outside of the building. Spicklemire was not in any way involved with the Detailers' operations and had no knowledge of whether they used chemicals in their operations, much less what those chemicals would have been if indeed any were used. His interaction with those tenants was confined primarily to going to the rear of the Site to collect rent when it was overdue. Also, on occasion, Spicklemire would go to the Detailers and asked them to stop running cars inside the building when that occurred. On four or five occasions, Spicklemire brought photo-processing machinery through the garage door located in the Detailers' space. Spicklemire claimed to have no knowledge of any chemical releases by the Detailers.

[9] In 2001, Spicklemire defaulted on the mortgage and abandoned the Site. Apex foreclosed and acquired title via a sheriff's deed, purchasing the Site via a credit bid of $240,000. After it acquired the property, Apex hired Keramida Environmental, Inc. (Keramida) in 2002 to conduct soil and groundwater samples at the Site. Keramida issued a report detailing the contamination it had discovered and suggesting further evaluation. Keramida's report estimated that the cost of remediation for the problems it discovered would exceed

$150,000. On October 9, 2003, Apex filed this action against Filmcraft. After the lawsuit was filed, Portrait America paid Patriot Environmental & Engineering, Inc. (Patriot) to inventory and remove all chemicals from the Site. The chemicals removed included a gas can, motor oil, and various paints. None of these chemicals were used in Filmcraft's operations.

[10] "After full and complete disclosure of all potential environmental issues known to Apex as a result of the Keramida [inspection]", Apex sold the Site to KLR for $20,000 in 2014. Exhibit 8B, paragraph 6, Admitted Exhibits Binder[2] (Exhibits Binder). "Apex accepted the $20,000 sale price for the Site from [KLR] as a discount from the earlier appraised value of $400,000 because of the potential environmental contamination at the Site discussed in Keramida's Phase II report [.]" *Id.* At this point, KLR was substituted for Apex as plaintiff in the present lawsuit. In 2013, KLR hired Terra Environmental Corporation (Terra) to perform additional tests on the Site. Terra's test results essentially duplicated those of the tests performed earlier by Keramida in that they revealed the presence of chlorinated solvents and petroleum hydrocarbons in soil and groundwater samples.

[11] As indicated above, the original and amended complaints alleged three statutory causes of action, including an ELA complaint under I.C. § 13-11-2-70.3 to recover costs associated with remediation of hazardous substances

---

[2] The pages in the Admitted Exhibits Binder (two volumes) are not numbered. The exhibits are, however, arranged in numerical order and tabbed, which expedited our review.

released into the soil or groundwater on the Site, an action under I.C. § 13-30-3-13(d) to recover expenses and attorney fees incurred because solid waste was illegally dumped on the Site, and an action under I.C. § 6-1.1-22-13 against Spicklemire for back taxes owed on the Site. Ultimately, default judgments were entered in favor of KLR against Demaree, the Wax Museum & Auto Sales, and Clean Car. Claims against Portrait America were settled before trial. Russ Dellen, Inc. prevailed on summary judgment. Therefore, all that remained were the claims presented in a second amended complaint filed by KLR against Filmcraft and Spicklemire.

[12] On March 28, 2013, KLR filed its Plaintiff's Preliminary Contentions, Itemization of Damages, and Witness/Exhibit Lists (Plaintiff's Preliminary Contentions), setting out for the first time among its "preliminary itemization of damages" common-law claims for lost rent and lost use. In response, Spicklemire sought summary judgment on KLR's common-law claims on grounds that they were never pleaded and that in any event they are not available to a property owner against a prior owner of the same property. KLR challenges the trial court's grant of this motion, which the trial court entered upon its finding that KLR was not entitled to recover economic damages under the ELA and that KLR had not pleaded any common-law claims.

[13] Trial commenced against the remaining parties on the remaining counts on February 19-21, 2014. At the conclusion of KLR's case-in-chief, Spicklemire and Filmcraft moved for involuntary dismissal under Trial Rule 41(B), arguing that upon the weight of the evidence presented by KLR, there had been no

showing of a right to relief. The trial court granted this motion and dismissed the complaint. KLR appeals the grant of the T.R. 41(B) motion and the grant of summary judgment on KLR's common-law claims, as well as the exclusion of certain expert testimony.

## 1.

We begin with KLR's evidentiary claim that the trial court erred in disallowing KLR's expert, Douglas Zabonick, Keramida's president, to testify about his opinion regarding whether the auto-detailing operations conducted on the Site during Spicklemire's ownership more likely than not used petroleum hydrocarbons and chlorinated solvents. During Zabonick's direct testimony, he was asked whether he had an opinion regarding whether the Detailers' operations more likely than not caused or contributed to the contamination at the Site. Spicklemire's counsel objected and asked the following preliminary question: "You don't have any knowledge whatsoever as to what chemicals these particular auto detailers were using at any time, do you?" *Transcript* at 909. Zabonick responded, "That would be correct." *Id.* Counsel objected to this line of questioning on the basis that Zabonick's testimony would be "just speculation." *Id.* KLR's counsel then proceeded to question Zabonick about whether his (Zabonick's) car had ever been to an auto detailing shop, and he responded that it had. When Zabonick was asked to describe that process, Spicklemire's counsel objected on grounds that "whatever nice experience Mr. Zabonick may have had with the detailing of his car is utterly irrelevant to what was going on with these auto detailers." *Id.* at 912. Spicklemire's counsel again

objected on grounds that Zabonick's testimony as it applied to the facts of the present case was "inherently speculative." *Id.* KLR contends the trial court erred in sustaining the objection.

[15] Indiana Evidence Rule 702 governs the admissibility of expert testimony, and provides as follows:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

[16] The admissibility of expert testimony under Evid. R. 702 is a matter within the trial court's broad discretion and we will reverse such determinations only for an abuse of that discretion. *Estate of Borwald v. Old Nat'l Bank*, 12 N.E.3d 252 (Ind. Ct. App. 2014). Expert testimony admitted under Rule 702 requires more than subjective belief or unsupported speculation. *Armstrong v. Cerestar USA, Inc.*, 775 N.E.2d 360 (Ind. Ct. App. 2002), *trans. denied.* In conducting our review, we presume the trial court's decision is correct, and the party challenging that decision bears the burden of persuading us that the trial court abused its discretion. *Id.*

[17] Citing *Vaughn v. Daniels Co.*, 841 N.E.2d 1133 (Ind. 2006), KLR argues that the trial court's ruling improperly requires that in order to be admissible, an expert's testimony must be based on first-hand experience. In *Vaughn*, the trial court

struck a paragraph in an affidavit completed by an expert and submitted by the opponent of a motion for summary judgment. Among other things, the proponents of the affidavit contended that the trial court erred in excluding that paragraph on grounds that the opinion lacked the requisite foundation. The trial court's ruling was premised upon the fact that the expert did not view the equipment in question, but rather reviewed only documents setting forth the defendant's proposal with respect to the equipment. Our Supreme Court reversed, holding that the expert's prior experience and review of documents relating to the proposal provided a sufficient foundation for the expert opinion and that it was not necessary for the expert to have actually seen the equipment in question for him to render an expert opinion.

[18] Although it is true that the *Vaughn* expert was permitted to offer opinion testimony even though he had not seen the equipment in question, it cannot fairly be said that the resulting opinion was based on "pure speculation." The expert's opinion as to the safety of the equipment at issue was based upon his review of a design drawing of that equipment rendered by its creator, who also happened to be a defendant. We reiterate, however, that in the present case, Zabonick admitted that he did not have "any knowledge whatsoever as to what chemicals these particular auto detailers were using at any time [.]" *Transcript* at 909. Thus, it appears that the only evidence that the Detailers could have caused or contributed to the particular contamination found at the Site involved pure speculation on Zabonick's part as to what chemicals they used. This is not legally sufficient. *See Estate of Dyer v. Doyle*, 870 N.E.2d 573, 581 (Ind. Ct. App.

2007) (the appellant challenged the admission of expert testimony regarding the faked left syndrome,[3] arguing that there was no evidence that the factual scenario occurred in which the syndrome would be applicable; the court reversed upon observing that the plaintiff "admitted during cross-examination that there was no evidence that [the decedent] was ever in [the defendant's] lane" and that "there must be some evidence other than the opinion itself that there was a 'faked left' occurrence for the opinion to pass muster"), *trans. denied*. The trial court did not err in excluding this evidence.

## 2.

KLR contends the trial court erred in granting summary judgment in favor of Spicklemire on KLR's common-law claims of lost rent and loss of use. The trial court held, in pertinent part:

> The Second Amended Complaint makes no mention of any common law claims. Nor are the operative facts asserted against Spicklemire sufficient for a reasonable person to be on notice that [KLR] is making claims under any common law theories. The facts pled in [KLR's] Second Amended Complaint are simply not

---

[3] This was explained in *Smith v. Yang*, 829 N.E.2d 624, 627 (Ind. Ct. App. 2005) as follows:

> This syndrome is seen near curves and/or hill crests where an initial vehicle enters the area left of center and the other driver steers to the left, now being left of center in avoidance, when the initial vehicle steers back to the right and a head-on collision occurs in the initial vehicle's traveling lane.

> sufficient to put a reasonable person on notice that [KLR] is asserting common law claims against Spicklemire.

*Appellant's Appendix* at 40.

[20] Summary judgment is appropriate where the moving party shows there are no genuine issues of material fact with respect to a particular issue or claim. Ind. Trial Rule 56(C); *Bleeke v. Lemmon*, 6 N.E.3d 907 (Ind. 2014). We review a summary judgment order *de novo*. *Hughley v. State*, 15 N.E.3d 1000 (Ind. 2014). Considering only the facts supported by evidence designated to the trial court by the parties, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." T.R. 56(C); *see also TP Orthodontics, Inc. v. Kesling*, 15 N.E.3d 985 (Ind. 2014). Where the moving party designates material demonstrating there are no genuine issues of material fact with respect to a particular issue or claim, the burden shifts to the non-moving party to come forward with designated evidence showing the existence of a genuine issue of material fact. *Bleeke v. Lemmon*, 6 N.E.3d 907. Upon review, we will accept as true those facts alleged by the nonmoving party. *Sees v. Bank One, Ind., N.A.*, 839 N.E.2d 154 (Ind. 2005). "All designated evidence and reasonable inferences must be construed in favor of the non-moving party, and doubts resolved against the moving party." *Bleeke v. Lemmon*, 6 N.E.3d at 917. The appellant bears the burden of demonstrating that the grant of summary judgment was erroneous. *Hughley v. State*, 15 N.E.3d 1000. Finally, we will affirm a grant of summary judgment on any theory supported by the record. *Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574 (Ind. 2013).

KLR argues that the grant of the summary judgment was improper on the stated grounds because Indiana is a notice-pleading state, and as such requires only a short, plain statement of the claim showing an entitlement to relief, and a demand for relief to which the pleader is entitled. *See* Ind. Trial Rule 8(A). KLR claims that its complaint met these criteria because its second amended complaint "pled the operative facts to support claims for lost rent and reduced property value [.]" *Appellant's Brief* at 41. In other words, the common-law claims were tried by consent.

In resolving this issue, it is important to note that at the time KLR filed its Plaintiff's Preliminary Contentions, the only claims that remained unresolved were those presented in the second amended complaint against Filmcraft and Spicklemire. In an introductory paragraph of the Plaintiff's Preliminary Contentions, KLR described its lawsuit against Spicklemire as an ELA action (i.e., "[KLR] brought this Environmental Legal Action ("ELA") against the defendants for the payment of costs to delineate and remediate this Site"). *Appellant's Appendix* at 103. It was in this document that KLR referenced for the first time its claim for lost rent and lost use. In response, Spicklemire filed a motion for summary judgment on grounds that the ELA permits recovery only of reasonable costs of removal or remedial action, and does not authorize claims for lost rent or loss of use. *See* I.C. § 13-30-9-2 (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through March 24, 2015). In its brief opposing Spicklemire's motion for summary judgment, KLR asserted that those costs

were recoverable under various common-law theories. This was the first time that KLR mentioned common-law remedies, or indeed described this lawsuit in terms other than an ELA action. This was approximately ten years after the onset of this litigation. Nevertheless, KLR contends these issues were tried by consent because the second amended complaint pleaded operative facts sufficient to support claims for lost rent and reduced property value, i.e., "these substances were deposited in the soil and groundwater during the Defendant's ownership and/or operations at the Site and remained there after the Defendants ceased ownership and/or operation at the Site and continue to cause property damage." *Appellant's Appendix* at 59.

[23] We first observe that the foregoing language cannot be deemed to have expressly presented the common-law claims in question. Not only are the concepts of "lost rent" and "loss of use" not pleaded with specificity, but the reference to continuing property damage is made in a complaint identified explicitly as an ELA action. This leaves only the possibility that the common-law claims were tried by implied consent of the parties, which is the main thrust of KLR's argument on this point.

[24] Trial Rule 15 (B) provides: "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Generally, we consider two factors when determining whether a party has impliedly consented to a non-pleaded issue at trial. First, did the opposing party have notice of the issue? Second, did the opposing party object to the issue being litigated at trial? *Mercantile Nat'l*

*Bank of Ind. v. First Builders of Ind., Inc.*, 774 N.E.2d 488 (Ind. 2002). Our Supreme Court has stated, "[i]f the opposing party both had notice and failed to object at trial, then that party will have impliedly consented to the non-pleaded issue at trial." *Id.* at 492-93. Both elements must be met in order for a party to be deemed to have impliedly consented to a non-pleaded issue. *See id.* at 493 ("[w]e find that Owner validly objected to the personal liability issue being litigated, and although Owner had notice of this issue, Owner did not impliedly consent to it being litigated within the meaning of Trial Rule 15(B)").

[25] Even assuming Spicklemire had notice of the common-law claims, his objection to the presentation of those claims when denominated as such for the first time in Plaintiff's Preliminary Contentions constituted a valid objection to those issues being litigated. Therefore, Spicklemire did not impliedly consent to litigating those issues at trial within the meaning of T.R. 15(B). The trial court did not err in granting summary judgment in favor of Spicklemire on KLR's common-law claims.

3.

[26] KLR contends the trial court erred in dismissing its complaint pursuant to Trial Rule 41(B) on grounds that KLR failed to present sufficient evidence to show Spicklemire caused or contributed to chlorinated solvent and petroleum hydrocarbon contamination of the Site.

[27] When reviewing a ruling on a T.R. 41(B) motion to dismiss, we apply the following standard of review:

> The grant or denial of a motion to dismiss made under Trial Rule 41(B) is reviewed under the clearly erroneous standard. In reviewing a motion for involuntary dismissal, this court will not reweigh the evidence or judge the credibility of the witnesses. We will reverse the trial court only if the evidence is not conflicting and points unerringly to a conclusion different from the one reached by the lower court.

*Todd v. State*, 900 N.E.2d 776, 778 (Ind. Ct. App. 2009) (quoting *Thornton–Tomasetti Eng'rs v. Indianapolis–Marion Cnty. Pub. Library,* 851 N.E.2d 1269, 1277 (Ind. Ct. App. 2006)).

[28] In this particular case, in granting Spicklemire's T.R. 41(B) motion, the trial court ruled that KLR failed to establish a viable ELA claim. In order to establish such a case, KLR was required to prove that Spicklemire "caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment." I.C. § 13-30-9-2. The parties stipulated before trial that "chlorinated solvents and petroleum hydrocarbons [had] been detected in the soil and groundwater at the Site." *Appellant's Appendix* at 45. Thus, in order to prevail, or, as the case may be, survive a T.R. 41(B) motion to dismiss, KLR was required to offer evidence that Spicklemire caused or contributed to the release of chlorinated solvents and petroleum hydrocarbons in the soil and groundwater at the Site.

[29] KLR contends that it did present such evidence, and further that the trial court's conclusion to the contrary is a result of the court applying the wrong legal standard. According to KLR, "[t]he ELA does not require a person who cleans

up a contaminated property to prove specific contaminating incidents with direct evidence." *Appellant's Brief* at 12. Rather, according to KLR, it is enough "to show with direct or circumstantial evidence that the defendant more likely than not 'had some involvement with the contaminants at issue' or 'helped bring about' contamination of the property." *Id.* (citing *Reed v. Reid*, 980 N.E.2d 277, 289 (Ind. 2012), *Gary v. Schafer* 683 F. Supp.2d 836, 855 (N.D. Ind. 2010), and *Neal v. Cure*, 937 N.E. 1227, 1234 (Ind. Ct. App. 2010), *trans. denied*)). KLR urges that "[e]ven if [Spicklemire] only helped spread contamination others put at the Site or contributed to one-half of 1 % of the contamination at the Site, he is liable under the ELA." *Id.* at 12-13. KLR claims that it presented evidence that Spicklemire contributed to a release of the contaminants by having some involvement with the contaminants. In essence KLR contends that Spicklemire helped spread the contaminants that were brought to and released onto the Site by others. As KLR phrases it, "it is against the logic and effect of the evidence presented at trial to hold that Spicklemire's 26 years of unlawful, chemical-laden operations and heavy daily discharges at the Site had absolutely <u>no</u> effect on the Site." *Id.* at 13.

[30] The standard to be applied in ELA cases alleging that a party "caused or contributed" to environmental contamination of the sort covered by the ELA was addressed by this court as follows:

> The phrase "caused or contributed" is not defined by statute, and we must give those words their plain and ordinary meaning. "Each term of the phrase 'caused or contributed' requires some involvement by the actor which produces a result." Standard

> English dictionaries may also be consulted in determining the meaning of this phrase. A standard dictionary definition of "cause" is "'a person, thing, fact, or condition that brings about an effect or that produces or calls forth a resultant action or state.'" "Among other things, 'contribute' means 'to act as a determining factor; share responsibility for something.'" Our goal when construing the phrase "cause or contribute" should be to hold accountable all parties "responsible for creating environmental contaminations."

*JDN Props., LLC v. VanMeter Enters., Inc.*, 17 N.E.3d 357, 360-61 (Ind. Ct. App. 2014) (internal citations omitted). Therefore, KLR is correct in that "caused or contributed" in this context requires proof that the defendant was in some way involved in the contamination of the property in question.

[31] In *Neal v. Cure,* 937 N.E.2d at 1234, the definition of "caused or contributed" was further refined for our particular purposes, i.e., in determining the liability of a landlord under the ELA. In *Neal*, the plaintiff sued a landlord under the ELA for contamination caused by its tenant. The landlord submitted a motion for summary judgment, arguing that it was not responsible for the contamination, nor was it aware that the contamination was occurring or had occurred. On appeal, the plaintiff argued only that the evidence demonstrated that the landlord "contributed" to (versus "caused") the contamination. The trial court granted the motion upon its conclusion that the plaintiffs had presented no evidence demonstrating an affirmative act on the part of the landlord that caused or contributed to the contamination. The court further concluded, "any alleged inaction on the part of [the landlord] … cannot form the basis for determining that the [landlord] caused or contributed to the

contamination." *Id.* at 1233. The court on appeal thus undertook to determine the meaning of "contributed" in this context and concluded that "the plain language of the statute does not permit an ELA action against landlords who 'by all accounts were not involved in the alleged release of hazardous substances and had no knowledge of the release.'" *Id.* at 1235 (quoting *City of Martinsville v. Masterwear Corp.,* 2006 WL 2710628, slip op. at 4 (S.D. Ind. 2006)).

[32] In the present case, the parties stipulated that Demaree was responsible for the chlorinated solvent and petroleum hydrocarbon contamination at the Site. The court found that subsequent purchaser Spicklemire had no involvement in the day-to-day operations of Filmcraft's subtenants, i.e., the Detailers, nor did he have knowledge regarding whether those subtenants used chemicals in their operations. Moreover, there was no evidence that the Detailers used any chlorinated solvents or petroleum hydrocarbons in their operations. Therefore, the evidence supported the determination that Spicklemire was not liable by virtue of his status as landlord vis-à-vis the Detailers and their operations on the Site.

[33] As for liability by virtue of Filmcraft's own activities, the direct evidence indicated that, with but one very minor exception, its operations did not involve the use of chlorinated solvents or petroleum hydrocarbons. The exception involved the use of a single tube of white grease – about three to four inches in size – which contained petroleum hydrocarbon. That single tube was used so sparingly that it lasted the entire time Filmcraft was in operation. This supports

the trial court's finding that Filmcraft's operations did not contribute to the petroleum hydrocarbon or chlorinated solvent contamination on the Site.

[34] We note also that sometime around 1980, Filmcraft purchased a fifty-five-gallon drum of photographic lacquer. Filmcraft also purchased four one-gallon cans of lacquer. None of these containers were ever used, or apparently even opened, because Filmcraft did not have enough lacquer orders to justify it. The full fifty-five-gallon drum was found during Patriot's chemical decommissioning, and was described by Patriot as sealed and not leaking. Patriot properly disposed of it. The evidence also showed that Filmcraft used small cans of aerosol lacquer, which was applied to photographs in a ventilated booth. Overspray ended up on the pegboard used to hold the photographs at the time, or was vented out of the building through an exhaust fan. Filmcraft used approximately one can (about the size of a can of spray paint) per month. This evidence supports the trial court's finding that Filmcraft's operations did not contribute to the petroleum hydrocarbon or chlorinated solvent contamination on the Site.

[35] Those chemicals that Filmcraft did use were heavily diluted with water, and effluent from the photo-processing operations was discharged into a trench drain that led to city sewers. Zabonick testified that the photo-processing effluent did not contain chlorinated solvents or petroleum hydrocarbons, and that discharge of photo-processing effluent to the trench did not cause contamination at the Site. The effluent did contain silver, but not in amounts above regulatory action levels in the soil or groundwater. A test of the soil

around the drain did not reveal the presence of silver in the soil. Moreover, we must bear in mind that this testing of the drain and sewer lines occurred in 2013, which was fully twelve or thirteen years after Filmcraft ceased operations on the Site. Again, this evidence supports the trial court's finding that Filmcraft's operations did not actively contribute to the petroleum hydrocarbon or chlorinated solvent contamination on the Site.

[36] We understand that the gist of KLR's argument is that the trial court applied an impossibly high standard in determining whether KLR had proven its case under the ELA. According to KLR, "the 'contributed' element of the ELA should not be interpreted to require an ELA plaintiff to produce direct evidence that the defendants released specific contaminants on specific dates, which caused the contamination driving the remediation decades later." *Appellant's Brief* at 8. It seems that KLR reads into the court's findings and conclusions the view that, in order to prevail under the ELA, KLR was required to present evidence that on a specific date Spicklemire contributed to the release of a particular contaminant into the soil or groundwater. We do not interpret the trial court's findings and conclusions to convey such an exacting standard.

[37] For purposes of this litigation, the important dates were those dates for which KLR could establish that Spicklemire was present on the Site, or had knowledge of or bore some responsibility for what was occurring on the Site. KLR adduced such evidence, establishing the date range of Spicklemire's ownership of the Site, the date range of Filmcraft's operations, and the date range of the operations of the subtenants, i.e., the Detailers. It was then up to

KLR to present evidence linking Spicklemire to the particular contaminants discovered to be present at the Site via the inspections performed by Keramida in 2002 and Terra in 2013, i.e., chlorinated solvents or petroleum hydrocarbons. As explained above, KLR's evidence did not establish that Filmcraft used products containing those contaminants in its operations, nor did Filmcraft's subtenants, the Detailers.

[38]    KLR points to the testimony of its expert, Zabonick, to the effect that "the historical operations of the Site have contributed to the contamination present at the Site." *Transcript* at 854. He went on to include Filmcraft as a contributor to that contamination on grounds that some of the chemicals used in the film processing operation "more likely than not would have contributed to the contamination or cause some additional contamination." *Id.* at 855. Yet, Zabonick also testified on this subject as follows:

> Q       Now, let's talk about your opinion that Filmcraft's photo and film processing operations contributed to the contamination at the site. You understand that Filmcraft used chemicals to develop film and photographs, correct?
>
> A       Correct.
>
> Q       You understand that these chemicals included developers, fixes, bleaches, as well as some other -- as well as water, correct?
>
> A       Correct.
>
> Q       You also understand that Filmcraft used a variety of machines when they developed film and photographs, correct?
>
> A       Correct.

Q    But it's not your opinion that day-to-day effluent or discharge from these machines contained any chlorinated solvents or petroleum hydrocarbons, is it?

A    That would be correct.

Q    In fact, you agreed with me that introducing chlorinated solvents would be detrimental to that photographic or film processing, didn't you?

A    I believe so.

Q    So rather you believe that Filmcraft may have conducted other activities at the site that contributed to that -- to the petroleum hydrocarbon and chlorinated solvent contamination, correct?

A    By "contributed to", are you meaning adding additional chlorinated and petroleum hydrocarbons or contributing to the migration of the existing contamination?

Q    Let's stick with your old opinion. Just contributing to the chlorinated solvent and petroleum hydrocarbon contamination at the site and then we'll talk about this migration.

A    Okay. Can you ask the question again, please.

Q    So you believe that Filmcraft conducted some other activities at the site other than discharging effluent that added something to the petroleum hydrocarbon and chlorinated solvent contamination at the site, correct?

A    Yes.

Q    And you believe these activities could have included cleaning the film and the developing equipment, is that right?

A    That's correct.

Q    Even though you have no knowledge of whether or not they used chlorinated solvents or petroleum hydrocarbons in that process?

A     That's correct.

Q     You also believe that these activities could have included cleaning film, correct?

A     Correct.

Q     What film cleaners did the photo processing, the photo and film processing operations use?

A     This specific operation?

Q     Yes.

A     I have no knowledge of any specific cleaners that they would have used.

Q     So you don't know the company that manufactured it, correct?

A     That would be correct.

Q     You don't know the chemical that they supplied, correct?

A     That would be correct.

Q     You don't know how Filmcraft may have used that chemical, is that correct?

A     That would be correct.

Q     How do you know that these operations could have contributed?

A     I guess I'm not sure – [.]

*Transcript* at 940-43. In light of this testimony, among other things, Zabonick's opinion as to Spicklemire's responsibility for the contamination was not so irrefutably supported by the direct and circumstantial evidence presented during KLR's case-in-chief that, in rejecting it, the trial court committed clear error. *See Todd v. State*, 900 N.E.2d 776. In the end, the evidence cited by KLR as

crossing the minimum threshold[4] is just too speculative to mandate a different result. We cannot say that the evidence pertaining to whether Spicklemire caused or contributed to contamination at the Site is non-conflicting and points unerringly to a conclusion different from the one reached by the trial court. *See id*.

[39] Judgment affirmed.

Kirsch, J., and Crone, J., concur.

---

[4] *E.g.* "The contaminants found at the Site *are consistent with* some of the petroleum hydrocarbons and chlorinated solvents *typically used by photo processors* during Filmcraft's operations." *Appellant's Brief* at 5 (emphasis supplied).